930 F.2d 1209
 Derrell E. UPTON, Plaintiff-Appellee,
v.
Bernie C. THOMPSON, Individually and in His Capacity as
Sheriff of Kankakee County, Defendant-Appellant.
Jack L. THULEN, Plaintiff-Appellee,
v.
Marvin BAUSMAN, Individually and in His Official Capacity as
Sheriff of Carroll County, Illinois, Defendant-Appellant.
 Nos. 90-1559, 89-3627.
 United States Court of Appeals,
Seventh Circuit.
 Argued Sept. 27, 1990.
Decided April 22, 1991.
 
 Timothy T. McLaughlin, Oak Lawn, Ill., for Jimmie R. Sweeney, Jack L. Thulen and Harlan L. Carbaugh.
 Marilyn Longwell, Charmaine E. Dwyer, Kerr & Longwell, Chicago, Ill., for Derrell E. Upton.
 James G. Sotos, Charles E. Hervas, James R. Schirott, Michael W. Condon, Schirott & Associates, Itasca, Ill., Richard R. Haldeman, Williams & McCarthy, Rockford, Ill., for Marvin Bausman.
 Charles E. Hervas, James G. Sotos, Michael W. Condon, Phillip A. Luetkehans, Schirott & Associates, Itasca, Ill., for Bernie C. Thompson.
 Before CUMMINGS, COFFEY and MANION, Circuit Judges.
 MANION, Circuit Judge.
 
 
 1
 These two cases before us on appeal, while distinct lawsuits, raise the same legal issues from similar facts making them suitable for disposition in a single integrated opinion.
 
 
 2
 Both cases involve appeals from denials of qualified immunity on motions for summary judgment by Sheriffs sued by their discharged deputies. The deputies claim that their discharges were impermissibly motivated by the Sheriffs' opposition to their political party affiliations, thus infringing on their First Amendment rights. The Sheriffs insist that the deputies' right to be free from this type of patronage firing was not clearly established at the time of the terminations, and therefore they are protected from liability under a theory of qualified immunity. The district courts in each case disagreed and denied qualified immunity to the Sheriffs. We conclude that at the time of the deputies' firings it was not clearly established that the deputies were protected from patronage firings under the prevailing doctrines. We further conclude that political considerations are appropriate for determining qualifications for the position of deputy sheriff. We reverse the decisions of the district courts.
 
 
 3
 I. Nature of the Case in No. 90-1559 (Upton)
 
 
 4
 In late August, 1986, Derrell Upton was hired as a probationary deputy sheriff in Kankakee County, Illinois. In November, 1986, Sheriff Scroggins, a Republican, lost the sheriff's election to the defendant, Bernie Thompson, the Democratic candidate. The Sheriff's Department of Kankakee County serves a rural Illinois community and employs between 70 and 80 deputy sheriffs. Thompson was sworn in as Sheriff on December 1, 1986. On December 6, 1986, Thompson terminated Upton. At the time of his termination, Upton was a probationary deputy, subject to at-will dismissal by the Sheriff (Ill.Rev.Stat. ch. 125, p 160 (1985)). Upton, an active member of the Kankakee County Republican Party, alleges that his termination resulted from his failure to support the Democrat Thompson for Sheriff in the November 1986 election and was in retaliation for his political affiliation in general.
 
 
 5
 During the campaign for Sheriff, Upton personally supported the incumbent Sheriff Scroggins in his bid for reelection and displayed a Scroggins bumper sticker on his car. During that same time Upton held the politically influential post of vice-president and acting president of the local chapter of the Illinois Fraternal Order of Police. Although Upton urged neutrality, the union members, by a majority vote, decided to endorse Sheriff Scroggins. In his capacity as a union official, Upton was questioned by reporters concerning the endorsement. Upton was clearly a political adversary of Thompson's, and was in a position to organize political opposition to Thompson.
 
 
 6
 Upton brought a civil rights action against Sheriff Thompson pursuant to 42 U.S.C. Sec. 1983 alleging that his dismissal was an impermissible punishment for his exercise of his First Amendment right to support the incumbent Sheriff Scroggins in the 1986 election. Although Sheriff Thompson denies the allegations of any political motivation in Upton's firing, for the sake of Thompson's affirmative defense of qualified immunity, the parties have stipulated that Thompson fired Upton for political reasons.
 
 
 7
 Sheriff Thompson moved for summary judgment on the grounds of qualified immunity, arguing that the termination of a deputy sheriff in 1986, even for political reasons, did not violate Upton's clearly established constitutional rights. The district court concluded such rights were clearly established and denied the Sheriff's motion for summary judgment. Sheriff Thompson appeals the denial of qualified immunity.
 
 
 8
 II. Nature of the Case in No. 89-3627 (Thulen)
 
 
 9
 The Carroll County Sheriff's Department is a small, rural office located in Mt. Carroll, Illinois. It employs only four full-time deputy sheriffs and 16 full-time employees.
 
 
 10
 The plaintiff, Jack Thulen, served as a Deputy Sheriff for Carroll County for 13 years under the administration of his brother and former Sheriff Jimmie Thulen, a Democrat. Jack Thulen's tenure began on the same day his brother Jimmie assumed the office of sheriff in 1970, and he served as chief deputy until Sheriff Thulen was defeated in the November 4, 1986 sheriff's election by the Republican candidate, Marvin Bausman.
 
 
 11
 During the 1986 campaign, Jack Thulen actively supported his brother's bid for re-election. In addition to being an outspoken supporter of Jimmie's candidacy, Jack Thulen helped the campaign by putting up signs and attending fundraisers. In his campaign against Jimmie Thulen, Marvin Bausman espoused a platform which was very critical of the Thulen administration. Specifically, candidate Bausman charged the incumbent administration with imprudent use and waste of public funds, poor leadership and lack of aggressive law enforcement.
 
 
 12
 Upon assuming office on December 1, 1986, Sheriff Bausman terminated Jack Thulen, who then filed a Sec. 1983 civil rights case against Bausman in both his individual and official capacities. Thulen claims he was fired for political reasons in violation of his First Amendment rights to freedom of association and expression. Bausman sought summary judgment on all allegations, including a claim for qualified immunity on the individual charge. The district court denied summary judgment on all claims.
 
 III. Analysis
 A. Standard of Review
 
 13
 Both Sheriffs appeal the district court denials of their summary judgment motions for qualified immunity. A district court's denial of a claim of qualified immunity is an immediately appealable final decision within the meaning of 28 U.S.C. Sec. 1291. Mitchell v. Forsyth, 472 U.S. 511, 530, 105 S.Ct. 2806, 2817, 86 L.Ed.2d 411 (1985). This court reviews de novo a district court's summary judgment determination in qualified immunity cases where the facts are not disputed. Jackson v. Elrod, 881 F.2d 441, 443 (7th Cir.1989). Upon appeal this court determines whether the substantive law has been properly applied by the district court. Id.
 
 B. Qualified Immunity
 
 14
 Under Harlow v. Fitzgerald, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), "governmental officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Id. at 818, 102 S.Ct. at 2738. "For executive officers in general, ... qualified immunity represents the norm." Id. at 807, 102 S.Ct. at 2732.[1] The right the official is alleged to have violated must have been "clearly established" in a "particularized" way and "the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Anderson v. Creighton, 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987). In Davis v. Scherer, 468 U.S. 183, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984), the Supreme Court stated that "whether an official may prevail in his qualified immunity defense depends upon the 'objective reasonableness of his conduct as measured by reference to clearly established law.' " Id. at 191, 104 S.Ct. at 3017 (quoting Harlow, 457 U.S. at 818, 102 S.Ct. at 2738). The principle behind the doctrine is that " '[i]f the law at the time was not clearly established, an official could not reasonably be expected to anticipate subsequent legal developments, nor could he fairly be said to know that the law forbade conduct not previously identified as unlawful.' " Greenberg v. Kmetko, 840 F.2d 467, 472 (7th Cir.1988) (quoting Harlow, 457 U.S. at 818, 102 S.Ct. at 2738). See also Cygnar v. City of Chicago, 865 F.2d 827, 843 (7th Cir.1989). What is important, in the final analysis, is "whether the legal norms governing [the government official's] behavior were clearly established at the time of the challenged actions." Wrigley v. Greanias, 842 F.2d 955, 958 (7th Cir.1988) (quoting Wade v. Hegner, 804 F.2d 67, 71 (7th Cir.1986)).
 
 
 15
 In further characterizing the suitability of applying qualified immunity, this court stated that "[q]ualified immunity is designed to shield from civil liability 'all but the plainly incompetent or those who knowingly violate the law.' " Hughes v. Meyer, 880 F.2d 967, 971 (7th Cir.1989) (quoting from Malley v. Briggs, 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986)). Immunity should be applied unless "it has been authoritatively decided that certain conduct is forbidden." Alliance to End Repression v. City of Chicago, 820 F.2d 873, 875 (7th Cir.1987). To prove the presence of a clearly established constitutional right, the plaintiff must point to "closely analogous cases" decided prior to the defendants' challenged actions. Rakovich v. Wade, 850 F.2d 1180, 1205 (7th Cir.), cert. denied, 488 U.S. 968, 109 S.Ct. 497, 102 L.Ed.2d 534 (1988).
 
 
 16
 The district courts rejected the Sheriffs' arguments that under these guidelines they should be held immune from suit for the politically motivated firings of deputy sheriffs. The district courts in both cases found that the firings violated the discharged employees' "clearly established" First Amendment rights under Elrod v. Burns, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976), Branti v. Finkel, 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980), and their progeny. According to the district courts, at the time the firings occurred (December 1986) it was clearly established under the First Amendment that a deputy sheriff could not be fired because his political affiliation and activity was different than the sheriff's. As such, the firing of the deputies in opposition to the "clearly established" prohibition vitiated the Sheriffs' immunity from suit for damages under 42 U.S.C. Sec. 1983.
 
 
 17
 As the district court accurately notes in its order in the Thulen case, the law "is unsettled"[2] as to whether partisan political affiliation is a proper job requirement for deputy sheriffs. The propriety of politically based firings of deputy sheriffs (as well as other positions) has received conflicting and confusing treatment when federal courts attempt to apply Elrod and Branti principles. In his dissent in Branti, Justice Powell predicted the problem we now confront: "The standard articulated by the court [in Branti ] is framed in vague and sweeping language. Elected and appointed officials at all levels ... no longer will know when political affiliation is an appropriate consideration in filling a position." 445 U.S. at 524, 100 S.Ct. at 1297-98.
 
 
 18
 In her 1989 article titled "A Decade of Branti Decisions: A Government Official's Guide to Patronage", Susan Martin outlines the variations and conflicts among the federal circuits in their application of Branti to patronage dismissal cases. Martin catalogues the cases decided under Branti, and reveals that there is a large middle ground of public employment for which the propriety of patronage dismissal receives ambiguous treatment under the Branti test. Martin writes: "After Branti, the test is whether party affiliation is an appropriate requirement for effective job performance. Jobs requiring party affiliation for effective job performance may or may not be of the policymaking or confidential variety." 39 Am.U.L.Rev. 11, at 22 (1989). That is, between the strictly menial govemment worker (who, under Elrod and Branti, is clearly and completely protected from patronage firing) and the policymaker/confidential assistant (whose protection from patronage firing is non-existent), there is a range of government positions for which the propriety of patronage firing has depended largely on the courts' juggling of competing constitutional and political values. The results have not been consistent. The failure of the courts to develop and apply a consistent set of principles concerning patronage dismissals creates a context in which the Sheriffs (absent a direct holding on the issue) could have no clear understanding as to whether the deputy sheriffs had any constitutional protection from a politically based discharge. The lack of clarity on this issue, as demonstrated by the analysis below, necessarily extends the protection of qualified immunity to the Sheriffs.
 
 C. First Amendment Claim
 
 19
 The grant of qualified immunity to the Sheriffs properly depends upon whether the deputies' right to be free from politically based firings was clearly established. A number of Supreme Court and Seventh Circuit cases govern our thinking. In Elrod v. Burns, supra, the Supreme Court addressed the question whether dismissal of public employees for political reasons violates the First Amendment. Elrod involved the dismissal of a number of noncivil service employees of the Cook County, Illinois, Sheriff's Department by the newly elected Democratic sheriff. The employees (none of whom were deputy sheriffs) were fired because they were not members or functionaries of the Democratic Party. In examining the role of the First Amendment in Elrod, the Court analyzed the history and purpose of the patronage system in American government. The Court acknowledged the administrative importance of having an elected official select employees who would be loyal to the official and his electoral mandate. Derivative of this would be greater efficiency in government with the introduction of politically compatible and highly motivated workers disinclined to subvert the incumbent administration's efforts to govern effectively. Therefore, politically based firings of the opponent's sympathizers are necessary to make way for accommodating and cooperative employees.
 
 
 20
 Contrasted to this, the Court observed a strong constitutional legacy of protecting the individual's freedom of association and his right to meaningfully exercise his political beliefs. A patronage system would be offensive to the constitutional rights of the government worker whose ability to enjoy the benefit of public employment should not ordinarily be contingent on his coerced association with the dominant political party or on the sacrifice of his own political activity. To accommodate the conflicting demands for efficient and responsive government and the First Amendment rights of government workers, the Court limited patronage dismissals to "policymaking positions." In the Court's view, limiting patronage dismissals to policymaking positions would sufficiently "insur[e] ... that representative government not be undercut by tactics obstructing the implementation of policies of the new administration, policies presumably sanctioned by the electorate." 427 U.S. at 367, 96 S.Ct. at 2687. "Non-policymaking individuals usually have only limited responsibility and are therefore not in a position to thwart the goals of the in-party." Id.
 
 
 21
 The Elrod Court did not provide precise guidance regarding who may be considered a policymaker suitable for patronage dismissal. Four years after Elrod, however, the Supreme Court in Branti v. Finkel, supra, revised the standard, stating: "the ultimate inquiry is not whether the label 'policymaker' or 'confidential' fits a particular position; rather the question is whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved." 445 U.S. at 518, 100 S.Ct. at 1295. In Branti, the Court decided that the First Amendment prohibited a newly appointed public defender from discharging assistant public defenders because they did not have the proper political support of the preferred party. In holding that employment as a public defender cannot be conditioned upon allegiance to the controlling party, the Court noted that "the primary office performed by appointed counsel parallels the office of privately retained counsel, ... the only responsibility of an assistant public defender is to represent individual citizens in controversy with the State ... not the public at large...." Id. at 519, 100 S.Ct. at 1295. Accordingly, assistant public defenders were protected under the First Amendment because the exclusive concern of that office is the legal needs of the individual clients which are generally untainted by partisan political interests.[3]
 
 
 22
 Since Branti, the courts of appeals have devised various tests for determining when "affiliation is an appropriate requirement" for employment or discharge. One major authority in the Seventh Circuit interpreting Elrod and Branti is Tomczak v. City of Chicago, 765 F.2d 633 (7th Cir.), cert. denied, 474 U.S. 946, 106 S.Ct. 313, 88 L.Ed.2d 289 (1985). Tomczak antedates the firings in the present controversy and is therefore significant to this case. In Tomczak, this court reversed a district court decision and held that a long-term employee who had worked his way up to the second-highest ranking position in Chicago's water department was not protected by the First Amendment's prohibition on patronage firings. This court noted that "Elrod and Branti require examination of the powers inherent in a given office, as opposed to the functions performed by a particular occupant of that office." Id. at 640 (citations omitted) (emphasis added). In specifying the official powers to be examined this court explained: "[t]he test is whether the position held by the individual authorizes, either directly or indirectly, meaningful input into government decisionmaking on issues where there is room for principled disagreement on goals or their implementation." (emphasis added). Id. at 641, citing Nekolny v. Painter, 653 F.2d 1164, 1170 (7th Cir.1981), cert. denied, 455 U.S. 1021, 102 S.Ct. 1719, 72 L.Ed.2d 139 (1982).
 
 
 23
 In Tomczak, we disagreed with the district court's contention that the plaintiff was not subject to patronage firing because the goal of the Water Department was to provide service to all residents without regard to politics and thus "there could be no principled disagreements about the basic policies of the Department. Cf. Jones v. Dodson, 727 F.2d [1329] at 1338 [4th Cir.1984]." Tomczak, 765 F.2d at 641. "This," we said, "is an unduly myopic view of the role of politics in the seemingly apolitical context of universal provision of services." Id. We suggested that politics always affect the implementation of policy:
 
 
 24
 The primary function of any local governmental entity is the provision of services such as police and fire protection.... Elections often turn on the success or failure of the incumbent to provide these services, and as campaigns develop, the opposing sides put forth varying proposals about how best to provide services. While the ultimate goal of all sides might be the same, there is clearly room for principled disagreement in the development and implementation of plans to achieve that goal. Therefore, the fact that plaintiff's position concerned the provision of water to all citizens does not mean that the Water Department had no goals about which there could be principled disagreements.
 
 
 25
 Id. at 641 (emphasis added).
 
 
 26
 In an earlier case, Livas v. Petka, 711 F.2d 798 (7th Cir.1983), this court confronted the "antithetical question" to that of Branti: whether political considerations can be an appropriate requirement for the effective performance of a public prosecutor's duties (Branti concerned public defenders). This court unequivocally declared, "[w]e believe the answer to this question is clearly 'yes.' " Id. at 801. In so holding, this court wrote:
 
 
 27
 A public prosecutor ... exercises broad public responsibilities in the performance of his duties. A prosecutor's "client" is not an individual, but society as a whole. And the prosecutor has the broad discretion to set whatever policies he or she believes necessary to protect the interests of society.
 
 
 28
 One of the problems faced by a prosecutor ... is that his policies are implemented by subordinates. Indeed, an Assistant State's Attorney may, in carrying out his or her duties, make some decisions which will actually create policy.... The public interest in the efficient administration of justice requires that decisions made by such assistant prosecutors conform with the broad objectives chosen by the prosecutor.
 
 
 29
 Id. at 800-801. For the above reasons, the prosecutor was "entitled to demand absolute loyalty from his assistants" and was permitted to dismiss anyone in whom he "lost confidence ... for whatever reason," including political reasons. Id. at 801.
 
 
 30
 Although this circuit has not specifically addressed the propriety of a sheriff's dismissing a deputy for political reasons, Tomczak and Livas provide definite guidance in resolving the question. In both Tomczak and Livas, nonpolicymaking officials were deemed subject to politically based firing because they were vested with substantial discretionary authority in the implementation of the policy goals of elected officials. The facts of these present cases suggest that a deputy sheriff helps to implement his superior's policies to the same degree as an assistant prosecutor or a deputy city commissioner, making deputies suitable for similar treatment under the First Amendment.
 
 
 31
 Like the prosecutor, the Sheriff is elected by the voters in a county to serve the public at large. His selection is based significantly on the popular approval of his expressed political agenda. The Sheriff, like the prosecutor, has "broad discretion to set whatever policies he or she believes necessary to protect the interest of that society." Livas, 711 F.2d at 800. Particularly in a small department, a Sheriff's core group of advisers will likely include his deputies. A deputy sheriff, in implementing the Sheriff's basic policy, will "make some decisions that will actually create policy." Id. at 801. As with the assistant deputy prosecutor in Livas, deputies on patrol or other assignment frequently work autonomously, giving them wide latitude and discretion in the performance of their duties and in the implementation of department goals. In order to promote public confidence in law enforcement, the Sheriff depends on his deputies to publicly project his competence and the competence of the office. Deputies are also expected to provide the Sheriff with truthful, accurate and beneficial information which he needs to make decisions and administer his office. While the circumstances of the Sheriff departments do not present an employment situation identical to a prosecutor's office, or that of a city water commissioner's, the position of these deputy sheriffs seems to fit within the Branti, Tomczak, and Livas exceptions to the prohibition on patronage firings, eroding any belief that the deputies' right to be free from political firing had been "clearly established."Given the dependency of the sheriff (and his political survival) on his deputies' job performance, it is understandable why a sheriff might believe that party loyalty is an appropriate consideration for a deputy sheriff. This conclusion is especially true in the case of Jack Thulen, who was the outgoing sheriff's brother and chief deputy in a very small department for many years. Thulen took a high profile in a hotly contested campaign which involved critical policy disputes relating to the proper operation of the Sheriff's Department. Thulen's political involvement extended beyond mere party affiliation; it included active opposition to Marvin Bausman, who became the newly elected Sheriff. To the voting public this could make Thulen appear hostile and unreliable in carrying out the policies of the new Sheriff. Deputy Upton, while apparently not as active (or at least as high profile) in campaign events as Jack Thulen, had certainly made his opposition to candidate (later Sheriff) Thompson well known. In addition, Upton's leadership of a policemen's union which opposed Thompson's candidacy made it questionable whether he could execute Thompson's policies. Even though Thompson's department was larger, thus diluting the potential disruptiveness of one deputy's opposing political alignment, Tomczak and Livas would still provide a reasonable legal foundation for the sheriff to terminate a deputy whom he concluded would interfere in carrying out his stated policies based upon that deputy's prior political activity. Thus it was not clearly established at the time of Upton's and Thulen's discharges that deputy sheriffs were protected from patronage firings under Elrod and Branti.
 
 
 32
 The deputies, however, claim that the Tomczak and Livas analyses are irrelevant because Perry v. Larson, 794 F.2d 279 (7th Cir.1986), directly answers in their favor the question of whether Elrod and Branti apply to deputy sheriffs. In Perry, a case decided about six months before the deputies' discharges, this court affirmed the sufficiency of a jury's verdict awarding damages in favor of a deputy sheriff in Wisconsin who was suspended and later discharged from his position, allegedly in retaliation for his decision to run against the defendant, the incumbent sheriff, for the office of Sheriff. The deputies suggest that by upholding the jury's verdict, which included punitive damages for the firing, this court implicitly held that the plaintiff's political activity was constitutionally protected and he was free from reprisals.
 
 
 33
 Perry, however, did not involve an Elrod-Branti analysis. Rather, the defendant in Perry challenged whether there was sufficient evidence to show that he terminated Perry for political reasons. This court imposed the usual heavy burden on the defendant to show there was no evidence that Perry's political activities were a substantial factor in the decision to terminate him. The defendant sheriff apparently did not raise and this court appropriately did not address the patronage issue or the immunity question, which would have required an Elrod-Branti analysis similar to those presented in Livas and Tomczak. Thus, Perry presents no basis for claiming a clearly established precedent preventing a sheriff from firing a deputy for political reasons. Moreover, while the exact grounds for the jury's verdict in Perry are not specified, there is a suggestion in the opinion that the deputy's firing took place in violation of an effective civil service ordinance. Id. at 283. In all likelihood, this ordinance would have given the plaintiff in Perry greater protection from patronage firing than the unprotected plaintiffs in this present action.[4]
 
 
 34
 Other circuits have split on the question of whether a deputy sheriff is protected from political discharge. In Jones v. Dodson, 727 F.2d 1329 (4th Cir.1984), the Fourth Circuit, applying Branti, did not believe that the duties of a deputy sheriff, "could be found to involve policymaking related to 'partisan interests' and to involve access to confidential information bearing ... on partisan political concerns ... no matter what size the office, or the specific position of power involved, or the customary intimacy of the associations within the office, or the undoubted need for mutual trust and confidence within any law enforcement agency.... On this basis we hold that if [the deputy sheriff's] discharge was solely because of his political party affiliation, it could not as a matter of law be justified under the Branti test." Id. at 1338 (emphasis added). But if the deputy's political activity was the basis for discharge, Jones would apply a more open-ended "balancing" inquiry.
 
 
 35
 This circuit in Tomczak and Livas has acknowledged a greater role for loyalty among those charged with the implementation of government programs than that expressed in Jones, although Jones did seem to allow considerable leeway for sanctioning combative political activity as opposed to mere political affiliation. We have permitted patronage dismissals to accommodate the need for loyalty in cases where loyalty is essential in the transmission of services. Unlike the court in Jones, this court, in determining whether political affinity is an appropriate job requirement for a position, has examined factors like "the specific position of power involved," (see Tomczak ) the "customary intimacy of association with the office," (see Livas ) and the "need for mutual trust and confidence" (see Livas ).
 
 
 36
 More recently in Terry v. Cook, 866 F.2d 373 (11th Cir.1989), the Eleventh Circuit, applying Branti, held that:
 
 
 37
 The closeness and cooperation required between sheriffs and their deputies necessitates the sheriff's absolute authority over their appointment and/or retention.
 
 
 38
 Under the Elrod-Branti standard, loyalty to the individual sheriff and the goals and policies he seeks to implement through his office is an appropriate requirement for the effective performance of a deputy sheriff.... We can find no less restrictive means for meeting the needs of public service in the case of the sheriff's deputy than to acknowledge a sheriff's absolute authority of appointment and to decline to reinstate those who did not support him.
 
 
 39
 Id. at 377. While a circuit split is not helpful in determining whether or not a deputy sheriff is protected by the First Amendment from patronage firing, such a split is indicative of the fact that the deputy sheriff's rights in this regard are currently unsettled as a matter of constitutional law and therefore were not "clearly established" at the time of the deputies' firings.[5]
 
 
 40
 Rutan v. Republican Party of Illinois, --- U.S. ----, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990), has recently complicated the patronage question by extending the termination rule of Elrod and Branti to all government personnel actions. "We hold that the rule of Elrod and Branti extends to promotion, transfer, recall, and hiring decisions based on party affiliation and support." Rutan, 110 S.Ct. at 2739. But the fundamental rule of Elrod and Branti remains the same, presumably as interpreted in this circuit by Livas and Tomczak. With the expanded coverage, new questions naturally arise. In the sheriffs' setting, promotion, transfer, recall, and hiring decisions within the Sheriff's Department could come under the same constitutional scrutiny as the terminations we examine here, unless otherwise controlled by statute, regulation, or contract. Justice Scalia in his dissent to Rutan (joined by three other Justices), highlights the impossibility of the courts' and government officials' position when trying to apply Branti: "interpretations of Branti [within the federal circuits] are not only significantly at variance with each other; they are still so general that for most positions it is impossible to know whether party affiliation is a permissible requirement until a court renders its decision." Id. at 2756. Justice Scalia in his dissent follows this observation with a litany of federal cases which itemize the various government positions in which one is or is not protected from patronage dismissals under Branti and Elrod. The comparison of the itemized positions receiving different treatment under Branti illustrate "that the tests used to implement Branti have produced inconsistent and unpredictable results." Id. at 2756-2757, including nn. 5-21 (emphasis added). Truly, as Justice Scalia points out, the indefiniteness of the applicable Branti standard has resulted in judicial confusion and inconsistency, a confusion that has naturally transpired to government officials having to apply Branti.
 
 
 41
 We conclude therefore that since the law was not clearly established in 1986 the sheriffs in these cases are protected by qualified immunity. What about 1991? As we noted in Livas, "The Branti court recognized that the pivotal inquiry is not whether a position is confidential or policymaking in character, but rather 'whether the hiring authority can demonstrate that [political considerations are] an appropriate requirement for the effective performance of the public office involved.' " Livas, supra at 800, quoting Branti, supra 445 U.S. at 518, 100 S.Ct. at 1295. We are thus confronted with the same question faced in Livas--"whether [political considerations] can be an appropriate requirement for the effective performance" of a deputy sheriff's duties. Id. In this situation we believe the answer is yes. Based on this court's approval of political terminations in other contexts, we conclude that deputy sheriffs operate with a sufficient level of autonomy and discretionary authority to justify a sheriff's use of political considerations when determining who will serve as deputies.
 
 
 42
 In some states a politically silent deputy would officially align with a party simply by voting in the primary election.[6] This contrasts sharply with the politically active deputy who, by vociferously campaigning for the loser, encounters Matthew 26:52: "All they that take the sword shall perish with the sword." State legislatures may choose to adjust state laws to protect some level of party affiliation or participation. Suffice it to say that under the First Amendment as interpreted by Branti, Livas, and Tomczak, a sheriff may use political considerations when determining who will serve as deputy sheriff. The judgments of the district courts with respect to the issue of qualified immunity are reversed. We further remand these cases to the district courts for proceedings consistent with this opinion.
 
 
 43
 REVERSED AND REMANDED.
 
 
 
 [1]
 Harlow was a suit against federal, not state officials, but as the Supreme Court stated in deciding the case, "it is untenable to draw a distinction for purposes of immunity law between suits brought against state officials under Sec. 1983 and suits brought directly under the Constitution against federal officials." 457 U.S. at 818, n. 30, 102 S.Ct. at 2738, n. 30
 
 
 [2]
 Judge Roszkowski's unpublished order of November 27, 1989, at 6, 1989 WL 200357
 
 
 [3]
 The Branti Court admitted that the official duties of a public prosecutor presented a different question, but declined to address it. 445 U.S. at 519 n. 13, 100 S.Ct. at 1295 n. 13. This issue is reached in Livas v. Petka, 711 F.2d 798 (7th Cir.1983), and is discussed infra
 
 
 [4]
 Present-day realities are that some deputy sheriffs are protected by some form of civil service laws and regulations which require due process and prevent political and other seemingly arbitrary terminations. While exceptions to the trend may keep this issue alive, the continuing close divisions in the courts emphasize that statutes and contracts are a much more viable method of job protection than reliance on blurry constitutional lines drawn by the courts. See, for example, Ind.Code Sec. 36-8-10-11, which states in part:
 (c) A county police officer [deputy sheriff] may not be dismissed, demoted, or temporarily suspended because of political affiliation nor after the office's probationary period, except as provided in this section. An officer may:
 (1) be a candidate for elective office and serve in that office if elected;
 (2) be appointed to an office and serve in that office if appointed; and
 (3) except when in uniform or on duty, solicit votes or campaign funds for the officer or others.
 See also Wis.Stat. 59.21(8)(b)(1); but see Ill.Rev.Stat. ch. 34, p 859.1, titled Merit System for Deputy Sheriffs, repealed by P.A. 81-1475 eff. Jan. 1, 1981.
 
 
 [5]
 The cases now before us are simplified by other factors not now on review but which were in place when each sheriff made his decision. In Upton, the terminated employee was a "probationary deputy" subject to "at will" dismissal by the sheriff under Ill.Rev.Stat. ch. 125 p 160 (1985). In Thulen, the Carroll County Board, two weeks before the new sheriff took office, withdrew civil service protection for the deputies by abolishing the Commission for Deputy Sheriffs. These are affirmative indications that would make it plausible for a sheriff to believe that the deputy sheriffs had no statutory or contractual rights to their jobs and could legally be discharged. These would be in addition to the signals from Branti, Tomczak and Livas, suggesting that the nature of the deputy sheriff's job makes party affiliation a suitable job requirement
 
 
 [6]
 In Tashjian v. Republican Party of Connecticut, 479 U.S. 208, 107 S.Ct. 544, 93 L.Ed.2d 514 (1986), the Supreme Court noted: "21 States provide for 'closed' primaries of the classic sort in which the primary voter must be registered as a member of the party for some time prior to the holding of the primary election ... Sixteen States allow a voter previously unaffiliated with any party to vote in a party primary if he affiliates with the party at the time of, or for the purpose of, voting in the primary. See ... Ill.Rev.Stat. ch. 46, p 7-43(a) ... IND.CODE Sec. 3-10-1-6." Id. at 223 n. 11, 107 S.Ct. at 553 n. 11