Thomas **KOLMAN**, Thomas Codilis, Rick Pere, et al., Plaintiffs–Appellants,

v.

Michael **SHEAHAN**, Sheriff of Cook County, Defendant–Appellee.

No. 93–2801.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 22, 1994.

Decided July 12, 1994.

Matthew J. Piers (argued), Steven R. Verr, Jonathan A. Rothstein, Jennifer L. Fischer, Gessler, Flynn, Fleischmann, Hughes & Socol, Chicago, IL, for plaintiffs-appellants.

Karen Dimond, Susan C. Salita (argued), Office of the State's Atty. of Cook County, Chicago, IL, for defendant-appellee.

Before BAUER and MANION, Circuit Judges, and GILBERT, District Judge.[*]

MANION, Circuit Judge.

After Republican James O'Grady was elected Sheriff of Cook County, he appointed the plaintiffs, who were also Republicans, to desirable jobs in a new department. But when Democrat Michael Sheahan defeated O'Grady in his re-election bid in 1990, the plaintiffs were demoted or terminated. The plaintiffs sued Sheriff Sheahan, claiming he denied them their First Amendment right to support the Republican Party. They also claimed a property interest in their jobs, and alleged that Sheriff Sheahan denied them this property interest without due process. The district court dismissed the First Amendment claim; we reverse that decision and remand. The district court granted summary judgment on the due process claim; we affirm that decision.

## I. Facts

In 1986, the voters of Cook County, Illinois elected Republican James O'Grady as sheriff. No doubt he brought some distinctive ideas to his office, and surely surrounded himself with loyal people to carry out his policies. In 1989, O'Grady established the Cook County Sheriff's Electrical Monitoring Unit (EMU). The EMU managed the use of electronic tracking devices for prisoners released from the Cook County Jail due to overcrowding. The plaintiffs—Thomas Kolman, Rick Pere, Thomas Codilis, Warren Anaya, Andy Rocus, Donald Malicki, and Kirk Surridge—were sheriff's department employees and active Republicans who supported O'Grady. Codilis and Malicki were promoted into the EMU and given the title Chief Deputy. The rest of the plaintiffs were hired into the EMU as investigators. With these appointments they all gained salary increases, improved working conditions, and other benefits.

O'Grady ran for re-election against Democrat Michael Sheahan in 1990. The plaintiffs actively supported O'Grady in his re-election bid. Sheahan won the election, and soon after that he terminated the plaintiffs from the EMU. Rocus and Malicki were dismissed from the sheriff's office altogether. The rest of the plaintiffs were reassigned to their previous positions in the sheriff's department; they lost any seniority they had accumulated before coming to and while at the EMU, and reverted to the lower salary of their previous positions. In 1990, Pere had taken and passed a qualifying test to become a police officer. Sheahan's administration never interviewed him for that position and, of course, never promoted him.

The plaintiffs sued Sheahan for these adverse employment decisions. They amended their complaint several times. In their Fourth Amended Complaint, which is before

* Hon. J. Phil Gilbert, District Judge for the Southern District of Illinois, is sitting by designation.

us, they made three claims. In count I, they alleged that they were "fired, demoted, forced to suffer loss of seniority, and denied the opportunity to be considered for promotions" in violation of the First Amendment, because they were Republicans who supported O'Grady. In count II, Pere alleged that he was illegally denied promotion under Illinois law, specifically 55 ILCS 5/3–7009 (Smith–Hurd 1992). In count III, they claimed that they had a property right to their jobs at the EMU, and were denied this property right without due process. Sheahan filed a motion to dismiss counts I and II, and a motion for summary judgment on count III. As to count I, the court determined that our decisions in *Upton v. Thompson*, 930 F.2d 1209 (7th Cir.1991), and *Dimmig v. Wahl*, 983 F.2d 86 (7th Cir.1993), created a *per se* right for sheriffs to fire subordinates for political reasons. Therefore, the court granted the motion to dismiss count I. The court also dismissed count II, determining that 55 ILCS 5/3–7009 simply did not create an action for failure to promote Pere. Finally, the court granted summary judgment on count III, concluding that the plaintiffs did not establish that they had a property right to their positions at the EMU. The plaintiffs have appealed the court's decisions on counts I and III.

## II. Analysis

### A. Standards of Review

This appeal involves both a dismissal under Fed.R.Civ.P. 12(b)(6), and summary judgment under Fed.R.Civ.P. 56. We review both the dismissal and the grant of summary judgment under a *de novo* standard. *Midwest Grinding Co., Inc. v. Spitz*, 976 F.2d 1016, 1019 (7th Cir.1992); *Hamilton v. Komatsu Dresser Indus.*, 964 F.2d 600, 603 (7th Cir.1992). For the dismissal we look to the complaint; we accept all material allegations made in the complaint as true, and we draw all reasonable inferences from the allegations in the plaintiffs' favor. *Scott v. O'Grady*, 975 F.2d 366, 368 (7th Cir.1992). We will affirm the court's dismissal if "it appears beyond doubt that [the plaintiff] can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355

U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957). For the summary judgment we look to the evidence; we view the evidence in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986). Summary judgment is authorized if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Anderson*, 477 U.S. at 247, 106 S.Ct. at 2509.

### 1. Political patronage.

While recognizing its political utility, courts have long struggled with the constitutional implications of political patronage: when does an elected official's need for loyal assistants conflict with a public employee's right to possess or express political beliefs? The Supreme Court has fashioned a precarious balance between a public official's prerogative to engage in patronage hiring and firing, and a public employee's freedoms of association and expression. In *Elrod v. Burns*, 427 U.S. 347, 372, 96 S.Ct. 2673, 2689, 49 L.Ed.2d 547 (1976), a plurality of the Court determined that the "need to ensure that policies which the electorate has sanctioned are effectively implemented," justifies patronage dismissal only for public employees in "policymaking positions." Four years later, the Court modified that standard somewhat. In *Branti v. Finkel*, 445 U.S. 507, 518, 100 S.Ct. 1287, 1294, 63 L.Ed.2d 574 (1980), the Court stated: "[t]he ultimate inquiry is not whether the label 'policymaker' or 'confidential' fits a particular position; rather the question is whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved." Like the *Elrod* criterion, the new standard required "examination of the powers inherent in a given office...." *Tomczak v. City of Chicago*, 765 F.2d 633, 640 (7th Cir.1985). But the new standard shifted the focus, from whether the office involved policymaking, to "whether the position held by the individual authorizes, either directly or indirectly,

meaningful input into government decision-making on issues where there is room for principled disagreement on goals or their implementation." *Id.* at 641.

The controlling precedent, therefore, requires that we look to the powers inherent in the plaintiffs' positions at the EMU, to see if they had meaningful input into government decisionmaking. *Tomczak,* 765 F.2d at 640, 641. But that type of specific inquiry is difficult at this early stage in the case. All that we know about the plaintiffs, their jobs and their dismissals is what they have alleged in their complaint; because the patronage question was resolved on a motion to dismiss, we are not able to reach beyond the complaint. *Scott,* 975 F.2d at 368. The complaint reveals little about the EMU, except that it somehow operates to monitor released prisoners of the Cook County Jail. The complaint divulges even less about the plaintiffs' responsibilities at the EMU, or the powers inherent in their jobs. We know only that Codilis and Malicki attained the title of Chief Deputy, and that the other plaintiffs were investigators. The complaint does not disclose what their jobs entailed or their level of contact with the sheriff. The complaint does not even describe the difference between a chief deputy and an investigator; we can only suppose that there was a difference.

At the outset it would be helpful to understand why, in order to accept these positions, most of the plaintiffs were "required to take an indefinite 'leave of absence' from [their] position[s] . . . as a condition precedent" to being promoted into the EMU. In accepting this condition they apparently left the insulation of being a "merit" or "non-exempt" employee where they would be subject to firing only for good cause. (See 55 ILCS 5/3–700 et seq.) It would be important to know if they accepted these new positions knowing that they were politically sensitive and thus had to relinquish the statutory protection provided in their former positions.

We cannot even resort to common knowledge to know about the plaintiffs' job responsibilities. The EMU is an obscure department in Cook County government, at least from the public's perspective. Contrast this with a more visible position, like a mayor's

chief of staff. If the chief of staff objected to his dismissal occasioned by a change in administrations, there would probably be no need for a court to view evidence about his job responsibilities before determining that his position involved meaningful input into decisionmaking. The court could probably dismiss the suit based on the obvious: that a mayor's chief of staff is indelibly connected to the decisionmaking process. *Cf. Soderbeck v. Burnett County, Wisconsin,* 752 F.2d 285, 288 (7th Cir.1985). In this circuit, we have recognized that sheriff's deputies in small police departments who are closely connected to the sheriff possess obvious decisionmaking roles: "[p]articularly in a small department, a sheriff's core group of advisors will likely include his deputies." *Upton,* 930 F.2d at 1215. We have since applied this principle to the patronage firing of a deputy sheriff for LaSalle County, Illinois. *Dimmig,* 983 F.2d 86. In that case, we concluded that the duties of the deputy sheriff were so obviously associated with decisionmaking that the sheriff was entitled to fire him based on political considerations. *Id.* at 87.

This case is not so clear-cut. Because we have no idea what goes on at the EMU, we are left with a myriad of possibilities. It is possible, for instance, that the EMU jobs involved no participation in decisionmaking. Perhaps Sheriff O'Grady appointed partisans into light duty assignments at the EMU as a reward for loyalty. On the other hand, it is also possible that the jobs were policy-making positions essential to Sheriff O'Grady's political agenda. For instance, the plaintiffs may have had some input into the decision to release criminals, or the treatment of released criminals, or the degree of monitoring of released criminals. The defendant has taken the position that because plaintiffs Codilis and Malicki attained the title Chief Deputy, they were necessarily decisionmakers under *Upton* and *Dimmig,* subject to patronage dismissal. But *Upton* and *Dimmig* do not create a *per se* rule that anyone who achieves the title of Chief Deputy necessarily inhabits a decisionmaking job. *Cf. Lohorn v. Michal,* 913 F.2d 327, 331 (7th Cir.1990). As previously mentioned, it is possible that the EMU was an inconsequential unit in the

sheriff's department and that leadership of that unit involved little if any meaningful decisionmaking power. In *Upton* and *Dimmig*, the deputies were obviously close to the sheriff and intricately involved in implementing the law enforcement policies advanced during his election. Therefore the deputies were subject to patronage dismissal.

Granted, it is unlikely that Sheriff O'Grady shuffled loyal partisans into meaningless jobs. It is very possible the jobs were political, decisionmaking positions. In our system, control of departments at all levels is important for those given the task of governing. And an elected official gains this control by strategically placing loyal people in these departments. "Elected officials must be able to rely on the political loyalty and compatibility of a policymaking civil servant in order to seize the reins of government and realize their electoral mandate." *Grossart v. Dinaso,* 758 F.2d 1221, 1226 (7th Cir.1985). Even jobs that at first glance may seem trivial, may nevertheless be vital to a public official's electoral mandate. In *Tomczak,* we noted that something as seemingly inconsequential as snow removal was "one of the biggest, if not the biggest, turning points in the 1979 Chicago mayoral election...." 765 F.2d at 641. And if it turns out that the plaintiffs were involved in matters relating to the furlough of prisoners, their jobs would probably touch upon something vital to Sheriff O'Grady's electoral mandate as well as something controversial in his past or upcoming election. Consider that many political careers have fallen victim to mismanagement or poor decisionmaking in prisoner furlough programs.

But we cannot affirm the dismissal based on a probability, when the allegations of the complaint allow for other possibilities. *See Randle v. Bentsen,* 19 F.3d 371, 375 (7th Cir.1994). The problem we face is that at this point in the proceedings—the motion to

dismiss stage—we simply do not know the nature of the plaintiffs' jobs at the EMU. Nor are the inherent powers of an EMU employee obvious to a federal judge viewing a blank record. And because of the possibility that the EMU jobs did not involve meaningful decisionmaking, we reverse the dismissal; resolution of this case was premature. This case must be remanded so that the facts about the plaintiffs' jobs can be developed in the district court. The "hiring authority" should be given the chance to demonstrate at the district court "that party affiliation is an appropriate requirement for the effective performance of the public office involved." *Branti,* 445 U.S. at 518, 100 S.Ct. at 1295.

On remand, the district court will likely encounter the patronage question again on summary judgment. The court will probably be given several undisputed facts about the function of the EMU, its overall role in the sheriff's department, and what the plaintiffs did on a daily basis. From these undisputed facts the court may come to a pretty clear understanding of the powers inherent in the plaintiffs' jobs. Once all of the undisputed facts about the plaintiffs, the EMU, and the defendant are before it, the district court will confront an array of holdings in this circuit dealing with patronage.[1] Without knowing the facts at this point it is difficult to determine whether the circuit has a precedent comparable to the plaintiffs' circumstances. Nor do we assume that the existing cases will necessarily resolve the question. There has been much satellite litigation around the issue of patronage. Justice Powell predicted this disarray in his dissent to *Branti,* where he stated that "[t]he standard articulated by the Court is framed in vague and sweeping language certain to create vast uncertainty." 445 U.S. at 524, 100 S.Ct. at 1297 (Powell, J. dissenting). Justice Scalia has more recently

---

1. *See, e.g., Heideman v. Wirsing,* 7 F.3d 659, 663 (7th Cir.1993) (probationary deputy sheriff); *Selch v. Letts,* 5 F.3d 1040, 1043 (7th Cir.1993) (subdistrict superintendent of Indiana Department of Highways); *Heck v. City of Freeport,* 985 F.2d 305, 308 (7th Cir.1993) (general inspector city health department); *Pounds v. Griepenstroh,* 970 F.2d 338, 340 (7th Cir.1992) (Indiana Department of Veteran's Affairs officer); *Upton,* 930 F.2d 1209; *Hudson v. Burke,* 913 F.2d 427, 431 (7th Cir.1990) (legislative aides). *See also Meeks v. Grimes,* 779 F.2d 417, 420 (7th Cir.1985); *Tomczak,* 765 F.2d 633; *Grossart,* 758 F.2d at 1226; *Shakman v. Democratic Organization of Cook County,* 722 F.2d 1307, 1309 (7th Cir.1983); *McClure v. Cywinski,* 686 F.2d 541, 545 (7th Cir.1982).

noted that *Branti* has produced a "shambles" of "inconsistent and unpredictable results." *Rutan v. Republican Party of Illinois,* 497 U.S. 62, 111–12, 110 S.Ct. 2729, 2757, 111 L.Ed.2d 52 (1990) (Scalia, J. dissenting). As we stated in *Upton,* there is a broad spectrum of decisions in this area, and "[t]he results have not been consistent." 930 F.2d at 1213.

If this circuit does not have an analogous case, perhaps Sheriff Sheahan was qualifiedly immune for his actions. See summary of qualified immunity law for patronage dismissal cases in *Pounds v. Griepenstroh,* 970 F.2d 338, 340–42 (7th Cir.1992). *See also Mitchell v. Thompson,* 18 F.3d 425 (7th Cir. 1994). But even a qualified immunity inquiry cannot take place until the facts about the EMU and the plaintiffs' roles there are put on the table. *See Rakovich v. Wade,* 850 F.2d 1180, 1209 (7th Cir.1988) ("Once the defendant's actions are defined or characterized according to the specific facts of the case, this characterization is compared to the body of law existing at the time of the alleged violation to determine if the constitutional, statutory, or case law shows that the now specifically defined actions violated the clearly established law.... [C]losely analogous cases ... are required to find that a constitutional right is clearly established."). On remand the parties should build the appropriate factual record to enable the district court to determine whether there is a closely analogous case.

#### 2. *Property right.*

In count III of their complaint, the plaintiffs claimed that they had a property right in continued employment at the EMU, and that Sheriff Sheahan denied this property right without due process by removing them from the EMU. To be successful on this claim, the plaintiffs first had to demonstrate that they had a property right in continued employment. *Cleveland Board of Education v. Loudermill,* 470 U.S. 532, 538, 105 S.Ct. 1487, 1491, 84 L.Ed.2d 494 (1985). The plaintiffs have claimed a property right in their positions in two ways: first, they assert that Illinois law confers such a right; and second, they assert that "rules of mutually

explicit understanding," *Gorman v. Robinson,* 977 F.2d 350, 356 (7th Cir.1992), within the sheriff's office created such a right. We shall consider each argument in turn.

A state statute may establish a property right to continued employment. *Cleveland Board of Education,* 470 U.S. at 538, 105 S.Ct. at 1491. The plaintiffs claim that they had a property right in their jobs at the EMU under Ill.Rev.Stat. Ch. 34, para. 3–7012 (now recodified as 55 ILCS 5/3–7012), which provides in pertinent part:

> Except as is otherwise provided in this Division, no deputy sheriff in the County Police Department ... and no employee in the County Department of Corrections shall be removed, demoted or suspended except for cause, upon written charges filed with the [Merit] Board by the Sheriff and a hearing before the Board thereon upon not less than 10 days' notice ...

At first blush, the statute does seem to confer some right to continued employment—or at least the right to be free from termination or demotion without cause—for deputy sheriffs. The question is whether the statute covers the plaintiffs: two chief deputies and five investigators at the EMU. To answer that question it is necessary to go beyond the isolated statement from paragraph 3–7012, and to view the entire statutory scheme of the Cook County Sheriff's Merit Board Act, Ill.Rev.Stat. Ch. 34, paras. 3–7001–3–7017, of which paragraph 3–7012 is only a part.

Paragraph 3–7002 creates the Sheriff's Merit Board, which, among other duties, is charged in paragraph 3–7006 to "establish a classification of ranks including those positions which shall be exempt from merit classification." Therefore, in order to avail themselves of the protections afforded deputy sheriffs under paragraph 3–7012, the plaintiffs would have to show that the Merit Board classified them as such. But the Merit Board did not rank the EMU positions. The plaintiffs concede this in their brief to the court: "The EMU investigator and chief deputy positions are not among the classified ranks as defined by the Sheriff's Merit Board." Not only that, Sheriff Sheahan submitted unrefuted evidence that the plaintiffs' positions were specifically exempted from

merit classification. Therefore, the plaintiffs cannot take advantage of paragraph 3–7012 to claim a right of continued employment at the EMU. That statute simply does not cover their jobs.

 Next, the plaintiffs claim that an unspoken pact in the sheriff's department created a "rule of mutually explicit understanding" conferring a property right in their jobs. They rely on *Gorman,* 977 F.2d 350, to make this argument. That case dealt with a Chicago Housing Authority (CHA) employee who was assured in his employee handbook that he could only be terminated for cause. This court found that no Illinois statute conflicted with the handbook, and therefore the CHA employee had a property right in his job. *Gorman,* 977 F.2d at 357. Two factors were present in that case that are not present here: a written assurance by the employer, and the lack of statutory guidance. Here, the plaintiffs can point to no such written assurance. They describe only some vague "common understanding between them and the Cook County Sheriff's Department." But they identify no writing or any other kind of manifestation of assent by the sheriff's department to evidence this common understanding. Which leads to the next point: the previously discussed statutory scheme protecting merit employees in the sheriff's department specifically exempted the plaintiffs. There is no possible inference to lead to the conclusion that the sheriff's department reversed this statutory scheme by some vague assurance, the content of which is not even contained in the record.

The district court was correct to grant summary judgment for Sheriff Sheahan on the procedural due process question. The plaintiffs have failed to introduce sufficient evidence that they have a constitutionally protected property interest in their jobs.

### III. Conclusion

For the foregoing reasons, we reverse and remand on the dismissal of the patronage question, and affirm the summary judgment on the due process claim.

Affirmed in Part, Reversed in Part, and Remanded.