**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

SCOTT CARTER,
<u>Plaintiff-Appellee,</u>

v.

DANIEL J. GOOD, individually and in

his official capacity as Sheriff of
Rutherford County; AETNA LIFE&
CASUALTY COMPANY, Surety,
<u>Defendants-Appellants.</u>

No. 96-1965

Appeal from the United States District Court
for the Western District of North Carolina, at Shelby.
Lacy H. Thornburg, District Judge.
(CA-94-200-4)

Submitted: April 14, 1998

Decided: May 19, 1998

Before LUTTIG and MOTZ, Circuit Judges, and
HALL, Senior Circuit Judge.

_____

Reversed and remanded by unpublished per curiam opinion.

_____

**COUNSEL**

G. Michael Barnhill, W. Clark Goodman, WOMBLE, CARLYLE,
SANDRIDGE & RICE, P.L.L.C., Charlotte, North Carolina, for
Appellants. Anita S. Hodgkiss, Rebecca S. Thorne, FERGUSON,
STEIN, WATT, WALLAS, ADKINS, GRESHAM & SUMPTER,
P.A., Charlotte, North Carolina, for Appellee.

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

Scott Carter, a former deputy sheriff in Rutherford County, North Carolina, brought suit under 42 U.S.C. § 1983 (1994), against Daniel Good, the county Sheriff, after Good allegedly fired Carter for political reasons. Carter obtained a position as a road deputy with the Sheriff's Department ("department") in April 1990, when Ed Searcy, a Democrat, was the sheriff. In the fall of 1990, Good, a Republican, took office. Good came up for reelection in 1994. Carter's supervisor, John Smart Jr., resigned from his position within the department in the fall of 1993 after announcing his plans to run against Good. Carter's father-in-law was Smart's close friend and ardent political supporter.

Carter alleges that during the campaign, Good solicited information from him regarding Smart's campaign strategy, and told him that he would be fired if he campaigned for Smart. Subsequently, Good and two other superior officers met with Carter and accused him of interfering with a federal drug investigation. As a result of this meeting, Good met with Carter in February 1994 to inform him that he was being transferred to the jail, which Carter considered to be an undesirable assignment. During this meeting, Carter told Good he would be supporting Smart "100 percent."

On March 4, 1994, Carter and a friend visited a local pizza restaurant, where they saw several on-duty members of the department. One officer approached Carter to express his condolences regarding Carter's transfer. There is some controversy over whether Carter attempted to give the on-duty officer a political brochure supporting Smart, but it is undisputed that Carter told the on-duty officer that he had been the only deputy sheriff with "the balls" to tell Good that he was supporting Smart for sheriff. Carter was wearing a "John Smart for Sheriff" hat at the time of the exchange.

2

After Good received word of this incident, Carter was terminated. While the defense alleges that Carter was guilty of various acts of insubordination prior to this incident, Good admitted at his deposition that the incident at the pizza restaurant precipitated Carter's termination. Other deputy sheriffs secretly recorded conversations with Good during the campaign in which he told them that if they did their jobs and did not campaign for his opponent they would retain their jobs. According to Carter, officers who opposed Good but did not actively campaign for his opponent retained their jobs after Good's reelection.

In Carter's view, therefore, his termination was not the result of his political affiliation, but the result of his verbalization of his opposition to Good. Carter contends that his statement to Good that he would support Smart, as well as his statement at the restaurant that only he had the courage to express his political stance, together with his sporting of the hat endorsing Smart, precipitated his termination. The district court agreed that this case involved alleged retaliation for the exercise of free speech rights, and thereby analyzed the case under the Supreme Court authorities applicable to such cases. See Connick v. Myers, 461 U.S. 138 (1983). See also Pickering v. Board of Educ., 391 U.S. 563 (1968). In applying these authorities, the district court found that Carter engaged in protected speech on the three occasions mentioned and that, for purposes of summary judgment, Good failed to prove that his interest in the efficient operation of his department outweighed Carter's right to political expression. In denying Good's motion for summary judgment, the district court went on to find that Good was entitled to neither qualified nor Eleventh Amendment immunity, and allowed Carter's suit, which included pendent state claims, to proceed to trial.

After Good appealed, we placed this case in abeyance pending our decision in Jenkins v. Medford, 119 F.3d 1156 (4th Cir. 1997) (en banc), cert. denied, 118 S. Ct. 881 (Jan. 26, 1998). After issuance of our decision, the parties submitted supplemental briefs addressing the impact of our decision on this case. Thus, the appeal is now ripe for disposition.

In Jenkins, the plaintiffs were North Carolina deputy sheriffs dismissed by a newly elected sheriff for, allegedly, failing to support the new sheriff's election bid, failing to associate themselves with the

3

new sheriff's campaign, and for supporting other candidates. The plaintiffs sought relief under § 1983 and state law. The district court denied the defendant sheriff's motion to dismiss, rejecting his claim of qualified immunity.

We found the district court's order to be a final order subject to de novo review on appeal. Id. at 1159-60. We then analyzed the plaintiffs' complaint under the analysis employed in Elrod v. Burns, 427 U.S. 347 (1976), and Branti v. Finkel, 445 U.S. 507 (1980). Those decisions hold that the propriety of a political patronage dismissal hinges on whether the relevant hiring authority can demonstrate that party affiliation is an appropriate requirement for effective performance of the position at issue. See Jenkins, 119 F.3d at 1160-61. If so, the general prohibition against political firings is inapplicable. Id.

Next, we examined the role of deputy sheriffs in North Carolina and concluded that "the office of deputy sheriff is that of a policymaker." Id. at 1164. Moreover, we found that whenever the position at issue "resembles" that of a policymaker, a communicator, or a person who is privy to confidential information, "then loyalty to the sheriff is an appropriate requirement for the job." Id. Accordingly, we held that "newly elected or re-elected sheriffs may dismiss deputies either because of party affiliation or campaign activity. Either basis serves as a proxy for loyalty to the sheriff." Id. (emphasis added). In finding that campaign activity could signify disloyalty just as much as party affiliation, we noted that "[w]e can think of no clearer way for a deputy to demonstrate opposition to a candidate for sheriff . . . than to actively campaign for the candidate's opponent." Id. at 1164-65. Because the deputies in Jenkins actively campaigned against the elected sheriff, we concluded that their dismissal violated no constitutional right. Absent such a violation, the defendant sheriff was entitled to qualified immunity. We therefore directed the district court to dismiss the plaintiffs' federal action as well as their pendent state claim. Id. at 1165.

Carter argues on appeal that the Jenkins decision is inapplicable to this case. He contends that he was fired for the content of his speech, rather than his political affiliation. He says that other deputy sheriffs who opposed Good but did not actively campaign against him kept their jobs, demonstrating that it is speech, rather than political affilia-

4

tion, that motivated his termination. He therefore asserts that the Connick-Pickering analysis, rather than the Elrod-Branti analysis employed in Jenkins, applies to this case, and that the district court properly found that he is potentially entitled to relief under Connick-Pickering because his interest in free speech is not outweighed by Good's interest in the efficient operation of his department.

Carter essentially asserts the same position expressed by the dissent in Jenkins. The dissent believed that the plaintiffs asserted an Elrod-Branti claim based on their allegations that they were dismissed for failing to associate themselves with the winning campaign, but that the deputies also alleged a Connick-Pickering claim based on their contention that they were terminated for supporting opposition candidates. See Jenkins, 19 F.3d at 1169. The dissent sharply criticized the majority opinion for applying the Elrod-Branti analysis to the plaintiffs' claims that they were dismissed for campaigning for the losing candidate. Id.

Moreover, contrary to Carter's assertion, the fact that he was more overt than some of his fellow deputies in opposing Good does not enhance his First Amendment protection in this context. The Jenkins decision relied on the reasoning of the Seventh Circuit in its decision in Upton v. Thompson, 930 F.2d 1209 (7th Cir. 1991). In Upton, two deputy sheriffs were dismissed by newly elected sheriffs because they openly supported the incumbent sheriff during the campaign. Deputy Upton displayed a campaign bumper sticker on his car and spoke to reporters in his capacity as a union member about the union's support of the incumbent. The other deputy, Jack Thulen, put up signs, attended fundraisers, and vociferously supported the incumbent. The Seventh Circuit applied an Elrod-Branti analysis, and concluded that by politically aligning themselves with the opposition candidates in such an overt manner, the plaintiffs thwarted the prevailing sheriff's ability to entrust those deputies to carry out his policies. The court stated:

> Given the dependency of the sheriff (and his political survival) on his deputies' job performance, it is understandable why a sheriff might believe that party loyalty is an appropriate consideration for a deputy sheriff. This conclusion is especially true for Jack Thulen . . . . Thulen took a high pro-

5

file in a hotly contested campaign which involved critical policy disputes relating to the proper operation of the Sheriff's Department. Thulen's political involvement extended beyond mere party affiliation; it included active opposition to Marvin Bausman, who became the newly elected Sheriff. To the voting public this could make Thulen appear hostile and unreliable in carrying out the policies of the new Sheriff. Deputy Upton, while apparently not as active (or at least as high profile) in campaign events as Jack Thulen, had certainly made his opposition to candidate (later Sheriff) Thompson well known.

Id. at 1216.

Later in its opinion, the court again emphasized the destructive effect of actively campaigning for a political opponent, as opposed to merely affiliating with the opponent, on the loyalty which a sheriff may demand in the interest of the effective operation of his office under Elrod-Branti. The court stated:

> In some states a politically silent deputy would officially align with a party simply by voting in the primary election. This contrasts sharply with the politically active deputy who, by vociferously campaigning for the loser, encounters Matthew 26:52: "All they that take the sword shall perish with the sword" . . . . Suffice it to say that under the First Amendment as interpreted by Branti [and Seventh Circuit cases] a sheriff may use political considerations when determining who will serve as deputy sheriff."

Id. at 1218.

Thus, the Elrod-Branti analysis is not displaced merely because a deputy sheriff's opposition to a sheriff goes beyond mere party affiliation. Rather, as found in Jenkins and Upton, such analysis, grounded in the desire to protect a sheriff's interest in loyalty so that he may carry out electorally mandated policies, logically applies with arguably even greater force where a deputy actively campaigns for the sheriff's political opponent. Acceptance of the Plaintiff's position in this case would run afoul of our decision in Jenkins.

6

Carter also alleges that whether he was fired for his political affiliation or for his political speech is a factual question, and that the presence of this factual issue precludes us from reviewing the district court's interlocutory order. We have, however, accepted as true for purposes of our review the facts as alleged by Carter, as we must in reviewing the district court's denial of qualified immunity. See Jenkins, 119 F.3d at 1159. While it is undeniable that the activity for which Carter alleges he was fired involved speech, it is also undeniable that this speech--in particular the speech at the pizza restaurant --constituted overt campaign activity for the sheriff's opponent. Jenkins holds that such activity, as a matter of law, is not constitutionally protected. Therefore, our review of the district court's denial of qualified immunity is not dependent upon any determination of fact.

Because Carter's termination violated no constitutional right, Sheriff Good is entitled to qualified immunity. We therefore direct the district court to dismiss Carter's federal claim. Moreover, the absence of a federal action requires dismissal of Carter's state claim as well. Id. at 1165. Accordingly, the district court's order denying summary judgment is reversed and this case is remanded for the entry of an order of dismissal.

REVERSED AND REMANDED

7