Leon WAGNER, Booster Hawkins, Harry Rose, Douglas Moore, James Yandell, John Cotner, Ann Oliver, Leon Baker, Troy Defore, Leroy Craig, Leroy Bass, Tim McCurter, Tommy Lloyd, Bob Ballard, Clarence Boyd, and Charley Speaks, Plaintiffs,

v.

Clyde HAWKINS, County Judge of Scott County, Arkansas, Individually and in his Official Capacity as County Judge, and Scott County, Arkansas, Defendants.

Civ. No. 85–2192.

United States District Court,
W.D. Arkansas,
Fort Smith Division.

April 28, 1986.

Gregory T. Karber, Pryor, Robinson & Barry, Fort Smith, Ark., for plaintiffs.

Betsy Hall, Hardin, Jesson & Dawson, Jerry D. Pruitt, Pruitt & Hodnett, Fort Smith, Ark., Paul E. Danielson, Booneville, Ark., for defendants.

## MEMORANDUM OPINION

ARNOLD, District Judge.

Plaintiffs initiated this action under 42 U.S.C. § 1983, claiming that their employment relationship with Scott County, Arkansas, was terminated in violation of rights to political expression guaranteed them by the First and Fourteenth Amendments to the United States Constitution.

Specifically, they claim that the defendant Clyde Hawkins, County Judge of Scott County, fired them from their jobs because they had supported his opponent in the Arkansas general election of 1984. They ask for reinstatement to their former positions and for damages occasioned by their wrongful discharge.

■ The Court believes that the resolution of this case is controlled by *Horton v. Taylor*, 767 F.2d 471 (8th Cir.1985), which contains detailed instructions for the guidance of district courts in cases of this kind. According to that case, if party affiliation was a motive for the discharge of government employees, the rule of decision is to be found in the principles announced in *Elrod v. Burns*, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976), and *Branti v. Finkel*, 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980). The essential teaching of those cases is that party affiliation cannot legally furnish a cause for termination of public employees unless "the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved." *Branti*, 445 U.S. at 518, 100 S.Ct. at 1295.

■ It might seem that *Elrod* and *Branti* are of dubious applicability here since the proof showed that none of the plaintiffs was of a different party from the defendant. The defendant County Judge is a lifelong Democrat and has held county office several times as a Democrat. All but one of the plaintiffs who testified as to party affiliation, and most did, said that they were Democrats; the sole exception stated that he was an Independent. Party affiliation, therefore, at least in the strictest sense, simply could not have been the reason for the employees' termination, since all, or almost all, of them were of the same party as the County Judge who fired them. Nevertheless, since they claim that they were fired because they supported the Judge's opponent, and she was a Republican, the assertion that they were discharged on account of their party affiliation is at least a colorable one. The *Hor-*

*ton* case, moreover, enjoins district courts to apply *Elrod* and *Branti* in cases alleging discharge for "political affiliation" as well as party affiliation. *See Horton*, 767 F.2d at 480. We shall therefore turn to the application of the *Elrod-Branti* principles to the facts of this case.

**I.**

Four of the plaintiffs, it seems to the court, perform work of a character so different from that performed by the other twelve that they deserve separate consideration. They are Ms. Ann Oliver and Messrs. Booster Hawkins, Harry Rose, and John Cotner. Ms. Oliver was discharged from her post as secretary to the county judge; Mr. Hawkins from his position as road foreman; Mr. Rose from his post as County Coordinator for Emergency Services; and Mr. Cotner from his position as Veterans' Service Officer.

■ The court believes that it does not require much elaborate argument to demonstrate that loyalty and confidentiality are required from a person in the position of secretary. While membership in a hostile political party, without more, would not render a secretary ineffective in her position, the County Judge is entitled to choose as a secretary someone whose loyalty and sense of common enterprise with him are not open to doubt. The effective working of the county government could well be jeopardized by any uncertainty as to the confidentiality of matters entrusted to the County Judge's secretary. This is especially obvious from the fact that, according to the testimony, the secretary had access to all of the material in the County Judge's office.

The foreman of the road crew in a rural county like Scott County is in many ways the Deputy County Judge. Certainly, after the County Judge himself, he is the most important person in the County Judge's office. The testimony established that upwards of seventy percent of the County Judge's time was devoted to the care and maintenance of county roads. The impor-

tant decisions as to how and when to devote the time and energies of the road crews are made by the Judge and road foreman together. In many ways, the foreman is the eyes and ears of the Judge so far as the condition of county roads is concerned. The influence on important policy decisions exerted by the road foreman, as established by the testimony in this case, puts it beyond serious question that his is a policy job and that political loyalty to the County Judge is necessary for the effective performance of his job. It cannot be effectively performed by someone who does not share the County Judge's philosophy of county administration.

■ The court views the Coordinator for Emergency Services and the Veterans' Service Officer as standing in relation to a County Judge much as department heads or cabinet members stand in relation to a governor. The County Judge is the chief executive officer of the county, and he must of necessity delegate much of his authority to others. The evidence showed that the Veterans' Service Director consults frequently with the County Judge, but he and he alone consults with veterans and their widows on a wide range of matters of concern to them, including benefits, pensions, and insurance. In response to a question from the court, the current occupant of this post testified that if any planning and setting of goals were done for his office, it would be done by him and the Judge together. Much of his implementation of that policy is done, of necessity, without the direct supervision of the County Judge. The Coordinator for Emergency Services, it was shown, had responsibility for preparing for and formulating plans for coping with emergencies. He was responsible, too, for coordinating such efforts of the various law enforcement agencies in the county as bore on emergency planning, and much of this work necessarily took place without the supervision of the County Judge. It is therefore plain that these positions were ones of trust and confidence, the work of which was often unsupervised, so that the risk of acts of deliberate disloyalty by those occupying them was not one that the County Judge was required to run.

## II.

So far we have considered this case as being one controlled by the principles announced by the Supreme Court in *Elrod* and *Branti.* In *Horton,* however, the Eighth Circuit Court of Appeals indicated that cases in which it was asserted and shown that overt political activity was a cause of the dismissal of public employees were to be decided by reference to the holdings in *Pickering v. Board of Education,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), and *Connick v. Myers,* 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). The so-called *Connick-Pickering* balancing test requires a court first to decide whether the employees' activity was one of public concern. If it was, then the court must balance

the degree of "public concern" legitimately had in the particular expression of ideas—as measured by the expression's content and context—against the degree to which the employee's conduct is justifiably viewed by the public employer as an actual or threatened disruption of the conduct of government operations for which the employer is responsible.

*Horton,* 767 F.2d at 480, quoting *Jones v. Dodson,* 727 F.2d 1329, 1334 (4th Cir.1984).

It would be difficult to imagine a matter of greater public concern than the qualifications of candidates for political office; and therefore, assuming that the *Connick-Pickering* balancing test is controlling, it becomes necessary to determine how important a quality political loyalty to the County Judge by these employees is to the proper conduct of the governmental operations for which he is responsible. It is the court's opinion that no effective County Judge can spend any significant amount of time worrying about whether his secretary, road foreman, and department heads are engaged in acts of political disloyalty aimed at sabotaging him and his administration.

Thus, whether one applies the *Elrod-Branti* line of cases or the so-called *Connick-Pickering* balancing test, it comes to the same thing: The County Judge was entitled to have trusted lieutenants in these positions and was thus free to choose for them people who had demonstrated loyalty to him in the past. As to these employees, then, the complaint will be dismissed.

### III.

We pass now to a consideration of the claims put forward by the other twelve plaintiffs.

These plaintiffs, in the view of the court, have relationships to the defendants entirely different, and legally distinguishable, from those just attended to. These plaintiffs are members of the Scott County road crew, and their duties are to grade roads, drive dump trucks, crush rock, and collect trash. The effective performance of their duties, is, of course, quite essential to the proper functioning of the county, but these plaintiffs are in no sense confidential employees or policy makers. In short, it is not possible to characterize these jobs as ones in which political affiliation is in any way a requirement for their effective performance. *See Horton,* 767 F.2d at 477–78. Since they are purely ministerial employees, under the direct supervision of the road foreman, the court must make a factual determination on the question of whether their political affiliation and activity provided any part of the County Judge's motive for terminating their employment.

It is admitted on all sides, and the evidence is uncontradicted, that the entire road crew supported the incumbent County Judge against the defendant in the Democratic primary. The defendant won the Democratic primary and then went on narrowly to defeat his Republican opponent in the general election. Upon taking office, he immediately fired fourteen of the twenty members of the road crew. The six retained had all been supporters of his in the general election; all of those fired had supported the Republican. The record clearly shows that it was common knowledge on the road crew what the political preference of all of its members was in the County Judge's race, and the testimony is all to the effect recited above.

Plaintiffs urge the court that this circumstance alone is sufficient to raise a strong inference of political motivation on the part of the County Judge in deciding whom to terminate and whom to keep. Indeed, it strains credulity to believe that these phenomena were purely coincidental. There must be a cause and effect inherent in them. The defendants admit the phenomena but urge a different cause and effect from that posited by the plaintiffs. Their version is that those whose employment was terminated received word early on that they would be fired for incompetence and thus became supporters of the Republican nominee in order to save their jobs, should she be elected, and, perhaps, in order to position themselves for this lawsuit. The County Judge testified that he let the six people he retained know his intention to retain them by around August 1. While he did not convey his opposite intentions to those terminated, he stated that it was "common knowledge" that they would be fired. He was vague on how that knowledge became current, but he opined that those members of the road crew not communicated with divined from his silence that they would be without jobs after he took office. The plaintiffs who testified on the subject, which was most of them, for the most part said that they did not know until January 2, 1985, that they were fired. Indeed, most of them showed up at the county barn that day to report to work. The defendants say that this was in order to preserve deniability on the point of their knowledge that they were to be terminated. All of the testimony on the issue of the employees' knowledge *vel non* is self-serving. It would have been useful to have testimony on this aspect of the case from persons with no, or a lesser, stake in the outcome, but none was forthcoming. Perhaps in the nature of things that was not possible.

■ Standing alone, plaintiffs' statistical case does nothing to indicate to the court which of the two equally permissible inferences that could be drawn from it ought to be given preference. Without more, the court would in fact be inclined to decide for the defendants on the ground that the plaintiffs have failed to meet the burden of proof. There was, however, some testimony to the effect that for a number of years in Scott County there had been a system in force under which those elected to the office of County Judge removed from public employment those who supported their opponent and replaced them with their own supporters. In other words, plaintiffs attempted to show that there was a patronage system of long standing by which they had been victimized. The preponderance of the testimony tended to show this fact. For instance, Mr. John Fred Evitts testified that when he was elected County Judge in 1978 he replaced opponents with persons who supported him, and this in accordance with established custom. Evidence of such a practice not so remote in time would have been entitled to more weight, of course, but this testimony is not totally without force. In the light, moreover, of other testimony in this case, it seems to be more likely than not that such a custom had existed in the County Judge's office for some time.

The plaintiffs also offered testimony from several members of the road crew that tended to show that the County Judge had made specific statements to them concerning his intention to replace those county employees who opposed him. Mr. Leon Wagner testified that the Judge told him that he was going to get rid of most of the crew because they were not supporting him. According to Mr. Wagner, the Judge's words were: "They didn't have nothing for me and I don't have nothing for them." Mr. Wagner said that there was no doubt as to what the Judge meant. So also Mr. Clarence Boyd testified that the Judge told him after the primary election that he would not have a job in 1985, but that there might be something for him later if he did not support the Republican nominee. The Judge told him, he said, to "keep his mouth shut." Likewise, Mr. Harry Rose testified that Judge Hawkins told him that retention of his job was contingent on supporting him for office. After Mr. Rose did not do so, Judge Hawkins informed him that he would no longer have his job, explaining that Mr. Rose was "just too politically involved." Then too, Mr. Charlie Speaks testified that when Judge Hawkins informed him that he would not have a job after he took office, the Judge said: "No hard feelings. I had to get all the votes I could." The implication was that Mr. Speaks's job had been promised to a supporter. There is also credible evidence to the effect that the Judge had promised jobs to his supporters both before and after the primary, and in circumstances that involved a likelihood that persons employed by the county, not his supporters, would have to be fired in order to make room.

■ In short, the court believes, and specifically finds as a fact, that Judge Hawkins's motive for terminating the employment of the twelve plaintiffs was that they had not supported him in his effort to defeat his Republican opponent in the general election of 1984. The court further holds that such terminations were in violation of the principles enunciated in *Branti* and *Elrod*, since political affiliation with the County Judge is not necessary to the effective performance of these plaintiffs' jobs. Finally, the court holds that an application of the so-called *Connick-Pickering* balancing test compels the same result, since the exercise by these plaintiffs of their political rights could not reasonably be regarded by the County Judge as a threat to the efficient performance of the duties he had to perform for the people of the county.

## IV.

Having decided that the exercise by these plaintiffs of political rights guaranteed by the United States Constitution played at least a part in the County Judge's decision to fire them, we now come to consider the implications for our case of

the decision in *Mt. Healthy City School District Board of Education v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). In that case, Justice Rehnquist, speaking for a unanimous court, wrote that in order for plaintiffs to prevail in such a case as this they must demonstrate that the illegal motive for their dismissal furnished a but-for cause of it. In other words, the court must be convinced by a preponderance of the evidence that plaintiffs would not have been discharged except for the operation of the impermissible motive. If the result was not caused by a constitutional violation, it gives rise to no cause of action under § 1983. This test is a good deal easier to state than to apply.

The County Judge testified, as to each county employee discharged, that he in fact discharged them for reasons having to do with their fitness for their individual jobs. He testified that after his victory in the 1984 Democratic primary, which he said he had reason to believe (and rightly) was tantamount to election in his part of the state, he began to make employment decisions so as to have all that sorted out when he took office on January 1 of the following year. Based on observations of the work done by the work crew, all of which were made before August 1, the Judge said, he made his decisions on whom to keep, whom to fire, and whom to hire. If this were the case, if the merits or lack thereof of the individual employees formed a part of the Judge's motive for their termination in addition to the political motive that the court has already decided was operating for the reasons adumbrated above, then the court would be obliged to decide whether the effect of these additional motives would have been sufficient to lead the Judge to the same employment decisions he in fact reached. But there is difficulty in believing that these additional motives were present at all. For one thing, the Judge testified that he had individual difficulties with the merits of four plaintiffs who were hired after August 1. If he had already made up his mind as to whom to hire by August 1, it would hardly have been necessary to offer reasons for termi-

nating persons hired thereafter. If the persons they replaced were persons whom the Judge had decided to retain, then this logic would be wrong, but that was not the testimony. All this makes the testimony as to those members of the road crew hired before August 1 less credible as well. Secondly, the court had the definite impression that the Judge was frequently evasive in his answers. For instance, he claimed that he did not know whether Mr. Kello Cole, one of the road crew members retained, had supported him or not; yet he later admitted that Mr. Cole had made a $200.00 contribution to his reelection campaign. His testimony that he did not know who among the road crew had supported his opponent, though they all knew themselves and many wore caps announcing their allegiance to his opponent, was not credible. On cross-examination, counsel for the plaintiff demonstrated that the Judge in his pre-trial deposition had given answers to questions touching on his motives for terminating these plaintiffs that were inconsistent with the answers he gave at the trial. In short, the court believes, and finds, that these employees were terminated solely on account of an impermissible motive and thus finds no occasion to apply the principles of *Mt. Healthy.*

The court is therefore of the view that these plaintiffs are entitled to reinstatement to their jobs and to damages and back pay in the amounts indicated in the appendix to this opinion. The court holds as well that Scott County is jointly liable with the individual defendant under the rule announced in *Pembaur v. City of Cincinnati,* —— U.S. ——, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986).

V.

The court wishes to make clear, though it may be obvious, that nothing in this opinion requires the retention of any of these plaintiffs should their work prove to be unsatisfactory. We hold only that they have been terminated for an improper motive and not that they have anything like a future en-

titlement to their jobs; they have the right not to be deprived of employment because of the exercise of the political freedoms guaranteed them by the Constitution of the United States.

There was testimony that the County Judge had occasion during a previous administration of his to reprimand and discipline one or more of the plaintiffs in this action. It may well be, as to them, that he would have reached the same employment decision had his motive not been, as the court has held, solely an impermissible one. That is, however, a speculative inquiry on which the court refuses to embark. Presumably, indeed, it is not entitled to make it. In any case, *Mt. Healthy* does not require it to do so. That case merely requires courts to decide whether, when two motives, one permissible and the other not, are in fact operating, the result complained of would have occurred anyway without the impermissible motive. Here, it is the court's view that only an impermissible motive was present.

A Judgment and Order consistent with this opinion will issue.

On motion of the plaintiffs, the court will entertain arguments and evidence on the question of attorneys' fees.

## APPENDIX

| NAME | WAGE RATE | WEEKLY RATE | DATES EMPLOYED | NUMBER OF WEEKS UNEMPLOYED | LOST WAGES FOR WEEKS UNEMPLOYED | OFFSET-UNEMPLOYMENT COMPENSATION, WAGES NOT EXCLUDED UNDER "DATES EMPLOYED" | TOTAL COMPENSATION DUE THRU 4/29/86 (lost wages minus offset) |
|---|---|---|---|---|---|---|---|
| LEON BAKER | $ 5.37 | $214.80 | 9/6–12/15/85 | 55 | $11,814.00 | $4,206.00 UC 270.00 wages in 1986 | $7,388.00 |
| BOB BALLARD | 5.05 | 202.00 | 7/1/85–present | 25.6 | 5,171.20 | 2,400.00 UC | 2,771.20 |
| LEROY BASS | 5.05 | 202.00 | * | 69 | 13,938.00 | 1,000.00 wages | 12,938.00 |
| CLARENCE BOYD | 5.37 | 214.80 | * | 69 | 14,821.20 | 576.00 UC | 14,245.20 |
| LEROY CRAIG | 5.37 | 214.80 | 6/15/85–present | 23.6 | 5,069.28 | 1,800.00 UC | 3,269.28 |
| TOMMY LLOYD | 5.37 | 214.80 | * | 69 | 14,821.20 | 1,408.50 wages in 1985 900.00 wages in 1986 | 12,512.70 |
| TIM McCURTER | 5.05 | 202.00 | 3/28/85–present | 12.2 | 2,464.40 | 1,200.00 UC | 1,264.40 |
| DOUG MOORE | 5.37 | 214.80 | 8/1/85–present | 30.2 | 6,486.96 | 2,652.00 UC | 3,834.96 |
| CHARLEY SPEAKS | 9,948.00 | 191.21 | * | 69 | 13,193.49 | 2,496.00 UC 200.00 wages | 10,497.49 |
| LEON WAGNER | 5.05 | 202.00 | * | 69 | 13,988.00 | 954.00 UC 3,000.00 wages | 9,984.00 |
| JAMES YANDELL | 5.05 | 202.00 | 7/15/85–present | 27.6 | 5,575.20 | 2,700.00 UC | 2,875.20 |

*Wages offset separately in "offset" column