**Larry POUNDS, Plaintiff–Appellee,**

v.

**David GRIEPENSTROH, Hugh Barclay, and Louis Lubbehusen, Defendants–Appellants.**

**No. 91–2732.**

United States Court of Appeals, Seventh Circuit.

Argued Feb. 13, 1992.

Decided Aug. 6, 1992.

Theodore Lockyear, Lockyear & Kornblum, Evansville, Ind., Frank R. Hahn (argued), Newburgh, Ind., for plaintiff-appellee.

James P. Casey, Bowers, Harrison, Kent & Miller, Evansville, Ind., James S. Stephenson, Kenneth Collier–Magar (argued), Stephenson & Kurnik, Indianapolis, Ind., Francis H. Lueken, Ferdinand, Ind., for defendants-appellants.

Before COFFEY and FLAUM, Circuit Judges, and ESCHBACH, Senior Circuit Judge.

COFFEY, Circuit Judge.

Larry Pounds, former Veteran's Service Officer (VSO) of Spencer County, Indiana, sued Spencer County and members of the

Spencer County Board of Commissioners, alleging that the Board's decision not to reappoint him as VSO in 1989 was politically motivated, and therefore violated his rights under the first and fourteenth amendments. 42 U.S.C. § 1983. The defendant commissioners moved for summary judgment on the ground of qualified immunity, but the district court denied the motion. We disagree with the trial court's finding and reverse, holding that the defendant commissioners are entitled to qualified immunity.

## BACKGROUND

Indiana's Department of Veterans' Affairs assists veterans in obtaining "any advantage, benefit or emolument" to which they may be entitled. Ind.Code § 10-5-1-3(a). The Department is headed by the Veteran's Affairs Commission, a four-person group appointed by the governor and containing no more than two members of the same political party, which establishes rules and regulations for the Department and makes general administrative policies. Ind.Code §§ 10-5-1-5(a) and 10-5-1-6. The Director of Veterans' Affairs, also appointed by the governor, oversees the Department's daily operation and ensures that the policies of the governor and the Commission are carried out. Ind.Code §§ 10-5-1-7 and 10-5-1-8. The Director likewise supervises the county and city VSOs, though they are appointed by the local county commissioners or city council. Ind. Code § 10-5-1-11.

In Spencer County the VSO serves a one-year term at the pleasure of the County Board of Commissioners. The plaintiff was appointed VSO in 1981 and again in 1982, but resigned in September of that year. He was appointed again in mid-1983, and reappointed every year until 1989. On January 3 of 1989 the three-member Board, containing two recently-elected commissioners (defendants Lubbehusen and Griepenstroh), chose not to reappoint Pounds, and instead appointed Don Patmore to the position of Spencer County VSO. Pounds filed suit, alleging that the Board refused to reappoint him because he was not a Democrat, and that this deprived him of his right to free speech and association and equal protection.

The district court denied the defendants' summary judgment motion, finding that they were not entitled to qualified immunity because they had not demonstrated that political allegiance was essential in a VSO. As allowed by *Mitchell v. Forsyth*, 472 U.S. 511, 530, 105 S.Ct. 2806, 2817, 86 L.Ed.2d 411 (1985) the defendants have taken an interlocutory appeal from this ruling. We review this decision *de novo. Upton v. Thompson*, 930 F.2d 1209, 1211 (7th Cir. 1991).

## DISCUSSION

In *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982) the Supreme Court held that

> governmental officials performing discretionary functions[ ] generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.

This protection, known as qualified immunity, serves an important purpose.

> Where an official could be expected to know that certain conduct would violate statutory or constitutional rights, he should be made to hesitate; and a person who suffers injury caused by such conduct may have a cause of action. But where an official's duties legitimately require action in which clearly established rights are not implicated, the public interest may be better served by action taken with independence and without fear of consequences.

*Id.* at 819, 102 S.Ct. at 2739 (footnote and internal quotation marks omitted). Qualified immunity shields officials from the burdensome demands often imposed on those who must defend a lengthy lawsuit by requiring the right allegedly violated to have been clearly established at the time of the official's action. *Id.* at 818, 102 S.Ct. at 2738. *Siegert v. Gilley*, — U.S. —, —– – —–, 111 S.Ct. 1789, 1793–94, 114 L.Ed.2d 277 (1991). The rationale is that

"[i]f the law at the time was not clearly established, an official could not reasonably be expected to anticipate subsequent legal developments, nor could he be fairly said to 'know' that the law forbade conduct not previously identified as unlawful." *Harlow*, 457 U.S. at 818, 102 S.Ct. at 2738. A right is "clearly established" for qualified immunity purposes only where "the contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates the right," and "in the light of pre-existing law the unlawfulness [of the official's acts was] apparent." *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987). Thus, where the law at the time of the act was not sufficiently developed to put the official on notice that his or her act would violate the plaintiff's statutory or constitutional rights, the official is immune from liability. This standard is high, but it serves the dual purposes of qualified immunity: it allows officials to carry out their duties confidently, without fear of incurring unexpected liability, and it allows courts to dispose of insubstantial claims prior to trial, sparing officials from unnecessary litigation. The standard is objective, based on what a reasonable official would or should have known and thought in the same circumstances, given the state of the law at that time. *Id.* at 639, 107 S.Ct. at 3038.

In this case Pounds contends that the defendants violated his right to be free from politically motivated employment decisions when they refused to reappoint him as county VSO because he was not a Democrat.[1] Generally, a public employee cannot be fired or subjected to other adverse employment decisions solely for political reasons. *Elrod v. Burns*, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976); *Branti v. Finkel*, 445 U.S. 507, 518, 100 S.Ct. 1287, 1294, 63 L.Ed.2d 574 (1980); *Rutan v. Republican Party of Illinois*, 497 U.S. 62, ——, 110 S.Ct. 2729, 2756, 111 L.Ed.2d 52 (1990). There is an exception to this rule where "the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved."[2] *Branti*, 445 U.S. at 518, 100 S.Ct. at 1295. Party affiliation is an appropriate job requirement where "the position held by the individual authorizes, either directly or indirectly, meaningful input into government decisionmaking on issues where there is room for principled disagreement on goals or their implementation." *Nekolny v. Painter*, 653 F.2d 1164, 1170 (7th Cir.1981). Given these standards, the question we must answer is: Could the defendants, in light of what they knew about the duties and powers of a county VSO and the law at the time, have reasonably believed that they could refuse to reappoint Pounds solely because of his political affiliation?

---

1. As evidence of the defendants' political animus, Pounds stated in his deposition that when he asked commissioner Lubbehusen whether the reason for the Board's decision was "one hundred and ten percent politics" Lubbehusen replied, "Yes, you're a big boy, you ought to understand that." Pounds Dep., at 148.

2. This language raises an interesting issue as to who bears the burden of proof in qualified immunity cases involving patronage dismissals. *Branti*'s reference to what "the hiring authority can demonstrate" indicates that the defendant official bears the burden of proving that political allegiance was essential to the plaintiff's effective performance. On the other hand, our cases state that, in order to defeat a claim of qualified immunity, the plaintiff bears the burden of pointing to analogous cases establishing that the constitutional right claimed to have been violated was clearly established. *Rakovich v. Wade*, 850 F.2d 1180, 1209 (7th Cir.) (en banc), *cert. denied,* 488 U.S. 968, 109 S.Ct. 497, 102 L.Ed.2d 534 (1988); *see also Upton v. Thompson*, 930 F.2d 1209, 1212 (7th Cir.1991); *Abel v. Miller*, 824 F.2d 1522, 1534 (7th Cir. 1987). Thus, there is a shifting burden of proof under these circumstances. Initially, the plaintiff must allege the violation of some constitutional right. *Siegert,* —— U.S. at ——, 111 S.Ct. at 1793–94. Next, the plaintiff must attempt to demonstrate that the right is clearly established by referring the court to analogous cases that would have put the defendants on notice that their acts were illegal. Finally, the defendants must respond to the plaintiff's argument by proving, through prior decisions or otherwise, that they could reasonably have believed that their acts were constitutionally permissible, either because the plaintiff's right was not so clearly established that the unlawfulness of their acts was apparent, or because political allegiance actually was a legitimate job requirement in the particular case.

Initially, we review the powers and duties of a county VSO, as the functions performed by an official often determine whether he plays a role in setting or implementing policy. Our inquiry is limited to the powers inherent in the office itself; we are not interested in whether or not a particular occupant may have turned the office into a political one. *Upton*, 930 F.2d at 1214; *Hudson v. Burke*, 913 F.2d 427, 431 (7th Cir.1990). The Indiana Code reveals that VSOs are appointed by the county commissioners to "render service to the veterans of said county" and are paid from county funds. Ind.Code § 10–5–1–11. Although the statute describing county VSOs does not specifically delineate the meaning of the phrase, "render service to the veterans," the section creating the Department of Veterans' Affairs states that officers of the department, including county VSOs,

> shall have full power and authority to do such acts at the request of any veteran of the armed forces, or his or her spouse, surviving spouse or dependents, which shall be necessary or reasonably incident to obtaining or endeavoring to obtain for the [veteran, spouse, or dependent] any advantage, benefit or emolument accruing, due or believed to be accruing or due to such person under any law of the United States, the state of Indiana or any other state ... by reason of the service of such veteran in the armed forces of the United States.

Ind.Code § 10–5–1–3. County VSOs must have the same qualifications and adhere to the same rules and regulations as members of the state Department of Veterans' Affairs. They are supervised by the state Director of Veterans' Affairs. *Id.* The commissioners' decision of whether to employ a county VSO and how to fund the position is discretionary. Ind.Code § 10–5–1–11. The VSO, in turn, is invested with discretion in the use of the county's funds once appropriated.

Having outlined the powers of a VSO, we turn to the law at the time of the defendants' decision to determine whether it was clearly established that a government employee in Pounds's position could not be fired for political reasons. As Justice Scalia observed in his dissent in *Rutan, supra,* the law governing patronage dismissals after *Branti* is almost incurably vague. "What [the *Branti* standard] means is anybody's guess ... [I]nterpretations of *Branti* are not only significantly at variance with each other; they are still so general that for most positions it is impossible to know whether party affiliation is a permissible requirement until a court renders its decision." *Rutan*, 497 U.S. at ——, 110 S.Ct. at 2756; *see also Upton*, 930 F.2d at 1213 ("between the strictly menial government worker ... and the policymaker/confidential assistant ... there is a range of government positions for which the propriety of patronage firing has depended largely on the courts' juggling of competing constitutional and political values."); *Meeks v. Grimes*, 779 F.2d 417, 419 (7th Cir.1985) ("the problems faced by the courts in applying the [*Elrod/Branti*] formulation have become increasingly intractable.") The difficulty officials face in predicting whether a certain position is a proper target for political hiring and firing is the natural result of the myriad of governmental bodies, departments, and positions, and the varying responsibilities of public employees. *Meeks*, 779 F.2d at 419. Indeed, it is difficult to imagine how any plaintiff, under *Anderson*, could have a clearly established right to be free from patronage dismissal unless a nearly identical case had already been decided. *Cf. Greenberg v. Kmetko*, 922 F.2d 382, 385–86 (7th Cir. 1991) (Cudahy, J., concurring) ("[T]he law of qualified immunity, as it has developed in this circuit, has tended to find qualified immunity in almost any case of first impression.")

This state of affairs injures both sides. A plaintiff has little chance of winning a case of first impression unless she occupies an extremely high or low rung on the bureaucratic ladder. *E.g., Tomczak v. City of Chicago*, 765 F.2d 633 (7th Cir.1985) (second-highest official in Chicago Water Department subject to patronage dismissal because he helped establish and implement policies for allocating water—a sometimes testy political issue); *Meeks*, 779 F.2d at

420–21 (court bailiffs not subject to political dismissal because they did not set policy or have access to confidential information). By the same token, though, government officials are hard-pressed to predict who can be replaced for political reasons, and so may be dissuaded from reaping the full benefit of their victory at the polls and rewarding loyal supporters. Faced with such uncertainty, it may be preferable to err on the side of caution and it might be well to find qualified immunity where we cannot confidently state that the right was clearly established or that the officials must have known their acts were proscribed by law. This is in line with the general principle that "public officials are entitled to immunity unless it has been authoritatively decided that certain conduct is forbidden." *Alliance to End Repression v. City of Chicago,* 820 F.2d 873, 875 (7th Cir.1987).

Furthermore, Pounds had the burden to find closely analogous cases showing that his right was clearly established and has failed to do so. *Upton,* 930 F.2d at 1212; *Rakovich,* 850 F.2d at 1209. In fact, the only decisions concerning local VSOs (or their functional equivalent) are cited by the defendants. *Savage v. Gorski,* 850 F.2d 64 (2d Cir.1988), a New York case, involved the First Deputy Service Officer of the County Veterans' Service Agency. The court held that the defendant County Executive could fire the officer for political reasons because his high salary, his contact with the public and veterans' organizations, and his power to interview veterans to determine their eligibility for benefits all indicated that he could affect the implementation of the executive's policies, and so a shared ideology was a legitimate job requirement. *Id.* at 69. In *Wagner v. Hawkins,* 634 F.Supp. 751 (W.D.Ark.1986) the chief executive officer of the county fired the VSO for political reasons. The court held that the chief executive was immune from liability for this action because the VSO met frequently with veterans concerning benefits issues and set goals and implemented policies with the chief executive's guidance, but primarily on his own. The court found that the VSO related to the county's chief executive much as a cabinet member relates to the governor, and therefore politics could be his undoing. *Id.* at 754.

The defendants claim these cases establish that the law in 1989 allowed them to reasonably believe they could appoint a new VSO based on ideology alone. After all, Pounds consulted with veterans and their families concerning benefits, filed reports with the commission, and essentially set his own goals and policies, some of which could be at variance with those of the commissioners. In other words, he held a position where there was room for "principled disagreement on goals or their implementation" and thus was terminable under *Nekolny.* 653 F.2d at 1170. Pounds, however, maintains that these cases are irrelevant because New York and Arkansas have different statutory schemes than Indiana. This is true of *Wagner,* where the county executive set policies for the VSO and directly supervised him. The facts in *Savage,* however, are fairly analogous to those in the instant case. *Savage* involved New York law, which states that county VSOs serve at the pleasure of the county executive, but report to the state Veterans' Service Agency. N.Y. Executive Law, §§ 357 and 358 (McKinney 1981). This is identical to the situation in Indiana, where the defendants appointed Pounds but he answered to state officials. Moreover, the primary duty of New York VSOs is to assist veterans in their county in obtaining available benefits, education or rehabilitation. *Id.* Pounds did the same. Pounds, then, had much in common with the official in *Savage,* and the Second Circuit held that the VSO there was subject to patronage dismissal even though he actually implemented the policies of state officials rather than the county executive. Though the *Savage* court did not offer a lengthy explanation for its decision, the logical rationale is that the VSO's discretionary choices concerning the budget and office policy could reflect on the executive and even run counter to the executive's broad objectives or goals for the county, or the executive's policy as to how and when,

and for what, county funds should be spent. In such circumstances, the executive could logically believe that it was important that the VSO share the same political outlook. *See Kurowski v. Krajewski,* 848 F.2d 767, 770 (7th Cir.1988) (suggesting that an official can consider the politics of appointees, even when those appointees, e.g. a judge or a member of the FTC, will be independent of the official once ensconced in office); *Tomczak,* 765 F.2d at 641 (noting that provision of public services is often an election issue, and therefore an elected official with specific policies on the subject is entitled to pick employees with the same views where these employees have some autonomy in expanding or implementing the policy).

Thus, *Savage* allows us to answer the key question in qualified immunity cases: Given the particular facts and the existing law, could the defendants reasonably have believed that their actions would not violate the plaintiff's rights? The answer here is yes. County VSOs in Indiana report to state officials and follow their policies, but they also must look to the county commissioners for funding, office space, and, most importantly, appointment. Moreover, county VSOs provide aid to local veterans, and it is possible that someone running for the elected position of commissioner could make promises to the public, and in particular the veterans, as to how the allocated funds will be used in social programs. When elected, the commissioner has every reason to believe that the only way to fulfill these promises is to appoint a VSO with a similar ideology. The law in 1989 did not clearly forbid such an act; *Savage* indicated that it was allowable, and cases from this circuit stated that anyone who played a significant role in setting or implementing policy could be fired for politics. *Nekolny,* 653 F.2d at 1170. Thus, the contours of the right to be free from politically motivated employment decisions were not so definite in 1989 as to make the unlawfulness of the defendants' acts apparent, and we therefore hold that Griepenstroh, Barclay, and Lubbehusen are entitled to qualified immunity under *Harlow* and *Anderson.*

REVERSED.