**Galen McGARVEY and Steven McGarvey, Plaintiffs,**

v.

**D. Eric BISWELL, Larry P. Hemann, and Marke L. Bobbitt, Defendants.**

**No. 96–3180.**

United States District Court, C.D. Illinois, Springfield Division.

Feb. 20, 1998.

Donald J. Hanrahan, Springfield, IL, for Plaintiffs.

Charles R. Schmadeke, Karen L. McNaught, Springfield, IL, for Defendants.

## *OPINION*

RICHARD MILLS, District Judge.

An *armored* semi-tractor trailer.

Carrying a load of frozen meat.

Stopped for speeding.

This civil rights case resulted.

Summary judgment for the officers.

## I. FACTS

Galen McGarvey and his son Steven McGarvey are the Plaintiffs in this case. In June 1995, they began working as armored truck drivers for United States Armored Company, a subsidiary of Western Distributing Company. Defendants D. Eric Biswell, Marke L. Bobbitt, and Larry Hemann are all Illinois State Police Officers.

On October 1, 1995, the McGarveys were passing through Morgan County, Illinois, on their way from their base in Denver, Colorado, to the Federal Mint in Philadelphia, Pennsylvania. They were driving a semi-tractor trailer loaded with frozen meat. The semi-tractor was considered an armored vehicle, but the frozen meat was not considered an armored load. Accordingly, the McGarveys wore street clothes rather than the uniforms they were required to wear when hauling armored loads. The truck had some of the attributes common to armored vehicles—thick bullet-proof windshield glass, gun ports, and black borders around the windows—but did not look like a conventional "Brinks" armored car. Lettering on the side of the truck read "U.S. Armored/Western Distributing Company."

At approximately 4:00 p.m., Defendant Trooper Eric Biswell stopped the McGarveys for speeding as they approached Jacksonville, Illinois. As Trooper Biswell approached the driver's window, Galen McGarvey displayed a printed sign reading:

NOTICE
THIS IS AN ARMORED VEHICLE
COMPANY POLICY PROHIBITS
OPENING THE DOORS.
CALL: 1–800–922–2289
UNITED STATES ARMORED CO.

The reverse side of the sign, which Galen[1] also displayed, directed the reader to follow the vehicle to a "secure facility" and to communicate with the driver via "C.B." radio.

Trooper Biswell returned to his squad car and contacted Galen by radio. The McGarveys informed Trooper Biswell that they could not identify themselves or stop along

---

**1.** Because Plaintiffs share a common last name, the Court will occasionally refer to them by their first names.

the side of the road for safety reasons. They further informed him that they would need to proceed to a safe location. After a brief radio exchange, the McGarveys pulled back onto the road followed by Trooper Biswell. At some point, Trooper Biswell radioed headquarters and informed them of the situation. The parties remained in radio contact and after some discussion, the McGarveys agreed to accompany Trooper Biswell to Illinois State Police District 9 headquarters in Springfield, Illinois. Trooper Biswell pulled ahead of the armored truck to lead the way. At some point en route, Defendant Sergeant Marke L. Bobbitt joined the parties and proceeded to escort the truck from behind.

When the vehicles arrived at District 9, the Illinois State Police blocked the exits. After the truck stopped, Steven McGarvey exited the passenger side of the vehicle and approached Trooper Biswell, Sergeant Bobbitt, another trooper named Rogers, and Defendant Master Sergeant Larry Hemann who had arrived on the scene. Steven displayed some form of identification.[2] After a brief exchange (the content of which is disputed), Steven demanded and secured the return of his identification. Master Sergeant Hemann told Steven in a raised voice to return to the truck. Steven got back in the truck.

The McGarveys sat in the truck for fifteen to twenty minutes awaiting the arrival of a U.S. Marshal whom Master Sergeant Hemann had summoned.[3] When the Deputy Marshal arrived on the scene, the McGarveys exited the truck at her request. The McGarveys presented the Deputy Marshal with various documents including driver's licenses, the company gun permits, receipts showing that they had applied for individual permits, and a copy of a federal statute entitled "State reciprocity of weapons licenses issued to armored car company crew members." *See* 15 U.S.C. § 5902. The McGarveys also showed Trooper Biswell a bill of lading showing that the truck contained frozen meat. Trooper Biswell asked the Plaintiffs if they were employees of United States Armored, and they

replied that they were. The Deputy Marshal called the president of Western Distributing Company and confirmed the Plaintiffs' status as employees.

The Deputy Marshal asked Plaintiffs if they had weapons in the truck. Galen McGarvey replied that they did. Master Sergeant Hemann and the Marshal then searched the cab of the truck after taking Plaintiffs' keys. The search revealed three loaded firearms, which were confiscated.

At approximately 8:00 p.m. Plaintiffs were arrested and brought to Sangamon County Jail on charges of unlawful use of a weapon and obstructing a peace officer. Galen McGarvey contends that before the arrest he asked for and was refused permission to retrieve from the truck certain medication he had been taking for breathing problems. Defendants deny that he ever made such a request and also deny that it was refused.

Plaintiffs were brought to Sangamon County Jail and placed in the custody of the jailers. Sometime after the McGarveys were booked into the jail, Galen McGarvey began to have trouble breathing. Approximately five hours after the arrest, a jailer secured the McGarveys' release on recognizance. Upon their release, a Sheriff's deputy transported the pair to St. John's Hospital where Galen McGarvey sought medical attention at the emergency room. He received another prescription and was advised to obtain over the counter medication as well.

Ultimately, the weapons and obstruction charges against the McGarveys were dropped. However, Plaintiffs state that they were required to return to Sangamon County for an initial appearance on December 6, 1995. Galen McGarvey pleaded guilty to speeding. The McGarveys also tried unsuccessfully to secure the return of their weapons at that time.

## II. COMPLAINT

Plaintiffs brought this civil rights action claiming primarily that Defendants violated their fourth amendment rights. They claim

---

**2.** The parties agree that Steven McGarvey displayed his driver's license but dispute whether or not he also showed his U.S. Treasury Department identification.

**3.** At some point after the McGarveys first encountered Trooper Biswell (the parties dispute exactly when), the McGarveys requested the presence of a U.S. Marshal. At some other disputed time, Police telecommunications summoned a Deputy Marshal.

damages resulting from lost work, lost wages from an inability to engage in "armored load" driving,[4] damage to their working environment and relationships, travel costs, attorney's fees, and replacement costs for their confiscated firearms. Plaintiffs also claim that items were missing from their truck after Master Sergeant Hemann conducted an inventory search of the cab of their truck. Specifically, they claim the loss of an engraved pen and Galen McGarvey's prescription medication. Defendant Master Sergeant Hemann denies having found or inventoried such items in the truck.

## III. SUMMARY JUDGMENT

Under Fed.R.Civ.P. 56(c), summary judgment "should be granted if the pleadings and supporting documents show that 'there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Ruiz–Rivera v. Moyer,* 70 F.3d 498, 500–01 (7th Cir.1995). The moving party has the burden of providing proper documentary evidence to show the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A genuine issue of material fact exists when "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby. Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Courts must consider evidence in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970).

## IV. ANALYSIS

Plaintiffs sued Defendants for money damages under 42 U.S.C. § 1983 claiming that Defendants violated their constitutional rights. Defendants respond that the doctrine of qualified immunity shields them from such claims. Government officials performing discretionary functions enjoy immunity from personal liability for civil damages so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982).

Therefore, whether Defendants are protected by qualified immunity will turn on the objective reasonableness of their actions. *Id.* at 819; *Fernandez v. Perez,* 937 F.2d 368, 370 (7th Cir.1991). "The qualified immunity standard gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." *Eversole v. Steele,* 59 F.3d 710, 717 (7th Cir.1995).

### A. Fourth Amendment

■ Plaintiffs' primary claim is that Defendants searched their truck and arrested them in violation of the Fourth Amendment. They contend that no probable cause supported the search and seizure because, as armored car drivers, they were statutorily exempt from the unlawful use of weapons statute.

Probable cause exists when "the facts and circumstances within [the officer's] knowledge and of which [the officer has] reasonably trustworthy information [are] sufficient to warrant a prudent [person] in believing that the [suspect] had committed or was committing an offense." *Booker v. Ward,* 94 F.3d 1052, 1057 (7th Cir.1996). The Illinois unlawful use of weapons statute provides that an offense is committed whenever a person knowingly "[c]arries or possesses in any vehicle ... any pistol, revolver, ... or other firearm." *See* 720 ILCS 5/24–1(a)(4). Plaintiffs do not contend, nor could they, that under the plain language of this provision, Defendants lacked probable cause to search and arrest them for unlawful use of weapons; Plaintiffs themselves furnished the probable cause by admitting that they had firearms in their vehicle. Rather, Plaintiffs essentially argue that, as armored truck drivers, they were statutorily exempt from the unlawful use statute. This exempt status, they conclude, undermined any probable cause to search and arrest that Defendants would otherwise have had.

Plaintiffs premise their argument on two statutes. First, they invoke the exemptions to the unlawful use statute enumerated in 720 ILCS 5/24–2. They point to two of these exemptions in particular. Subsection (a)(4) provides that the relevant unlawful use provi-

---

4. Apparently, armored loads can be hauled only by armed drivers. Thus, the confiscation of

Plaintiffs' weapons allegedly prevented them from hauling the higher paying armored loads.

sion will not apply to "guards of armored car companies, while actually engaged in their employment or commuting between their homes and places of employment." 720 ILCS 5/24–2(a)(4). Similarly, under subsection (a)(9), the provision will not apply to any "person employed by an armored car company to drive an armored car, while actually engaged in the performance of his duties." 720 ILCS 5/24–2(a)(9).

■ Plaintiffs also rely on 15 U.S.C. § 5902 which mandates state reciprocity for out-of-state weapons licenses issued to armored car company crew members. Subsection (a) of this statute provides:

> If an armored car crew member employed by an armored car company has in effect a license issued by the appropriate State agency (in the State in which such member is primarily employed by such company) to carry a weapon while acting in the services of such company in that State, and such State agency meets the minimum State requirements under subsection (b) of this section, then such crew member shall be entitled to lawfully carry any weapon to which such license relates in any State while such crew member is acting in the service of such company.

15 U.S.C. § 5902(a). Subsection (b) then sets forth minimum requirements that an "appropriate State agency" must meet in order to issue a weapons license that will bring an armored crew member within the protection of subsection (a). Such an agency must require a crew member to provide it with annual information about the crew member's weapons training with a "qualified instructor" and also provide information establishing that the receipt or possession of a weapon by the crew member would not violate Federal law, "determined on the basis of a criminal record background check." 15 U.S.C. § 5902(b).

It is clear at the outset that Plaintiffs will have difficulty overcoming the defense of qualified immunity by relying on the armored car exemptions and the federal reciprocity statute. Plaintiffs shoulder the burden of pointing to a closely analogous case showing that their right not to be searched and arrested was clearly established. *Pounds v. Griepenstroh*, 970 F.2d 338, 342 (7th Cir.1992). Plaintiffs cite no case to support their argument that either of these two statutes render invalid an arrest which is otherwise supported by probable cause. In fact, the Court has found no cases interpreting the language of the reciprocity statute or the armored car exemptions in *any* context. To conclude that the search and arrest in this case violated clearly established law based on the uninterpreted language of these statutes would run afoul of the principle that "public officials are entitled to immunity unless it has been authoritatively decided that certain conduct is forbidden." *Alliance to End Repression v. City of Chicago*, 820 F.2d 873, 875 (7th Cir.1987).

Even if the uninterpreted language of these provisions could speak for itself, the Court finds that "officers of reasonable competence could disagree," *Maltby v. Winston*, 36 F.3d 548, 556 (7th Cir.1994), about whether it would have exempted Plaintiffs from the unlawful use statute. At the time of the arrest, Plaintiffs were hauling frozen meat, a cargo which is not considered an armored load; they were dressed in street clothes rather than the uniforms they are required to wear when hauling armored loads; and finally, they were driving an armored semi-tractor trailer rather than a more conventional "Brinks" armored car.[5] Under these circumstances, qualified immunity would certainly protect an officer who erred on the side of caution and concluded that Plaintiffs were not acting as "armored car crew mem-

---

**5.** Plaintiffs ascribe great importance to the fact that Defendant Master Sergeant Hemann stated in a deposition that the only reason he thought Plaintiffs did not fall within the protection of the reciprocity statute was because the truck was hauling frozen meat rather than money or other unusually valuable cargo. However, an officer's subjective evaluation of the legal significance of certain facts is generally not relevant to the probable cause inquiry. *Richardson v. Bonds*, 860 F.2d 1427, 1431 (7th Cir.1988). Instead, the propriety of an arrest turns on the officer's subjective awareness of facts sufficient to constitute probable cause. *Id.* at 1430. In any case, the Court finds Defendant Master Sergeant Hemann's reading of the reciprocity statute entirely plausible. Several portions of that statute suggest that Congress only intended it to protect armored car company employees hauling unusually valuable cargo. *See, e.g.,* 15 U.S.C. § 5901(1) & (2) (Congressional findings focusing on the armored car industry's role in transport-

bers" or "guards of armored car companies" or persons "actually engaged in the performance of" driving "an armored car." *See* 15 U.S.C. § 5902; 720 ILCS 5/24–2(a)(4) & (9). Officers in the field cannot be expected to make probable cause determinations as would the "legal technicians of the prosecutor's office." *Williams v. Kobel,* 789 F.2d 463, 468 (7th Cir.1986) (internal quotations omitted) (quoting 2 LaFave & Israel, *Criminal Procedure* § 14.3(a) (1984)). "[U]ncertainty must be tolerated because of the need to allow the police to take affirmative action in ambiguous circumstances." *Id.*

Finally, the Court doubts that the legislatures enacting the unlawful use exemptions and the reciprocity statute intended these provisions to deter officers from searching or making arrests in close cases. The unlawful use exemptions of 720 ILCS 5/24–2 are numerous and complex, and the Illinois courts have construed them narrowly. *See Marshall v. Walker,* 958 F.Supp. 359, 365 (N.D.Ill.1997) (citing cases). As the Illinois Supreme Court has observed, to require the state to negate each exemption "would place impossible burdens upon the effective prosecution" of the unlawful use offense. *People v. Smith,* 71 Ill.2d 95, 105, 374 N.E.2d 472, 15 Ill.Dec. 864 (1978). Accordingly, "the State need never negate any exemption." *Id.* As for the federal reciprocity provision, its structure and relative complexity do not suggest that it was designed to guide the decisions of officers in the field. An officer looking over a permit (or a receipt for a permit application as in this case) could not easily determine whether or not it was issued by a state agency meeting the "[m]inimum state requirements" of 15 U.S.C. § 5902(b).[6]

Accordingly, the Court concludes that Defendants are shielded from Plaintiffs' fourth amendment claims by the doctrine of qualified immunity.

### B. Eighth Amendment

Plaintiffs may also be making an eighth amendment claim based on Defen-

dants' alleged refusal to give Galen McGarvey his medication.[7] In order to make such a claim under the Eighth Amendment, a plaintiff must prove an official's "deliberate indifference" to a substantial risk of serious medical harm. *Farmer v. Brennan,* 511 U.S. 825, 828, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). Deliberate indifference requires proof that the official was "subjectively aware" of the risk. *Id.* In addition, the medical deprivation must be "objectively, sufficiently serious" to constitute "the denial of the minimal civilized measure of life's necessities." *Snipes v. DeTella,* 95 F.3d 586, 591 (7th Cir.1996) (quoting *Farmer,* 511 U.S. at 834). A risk of such magnitude must present a likelihood of "serious damage to [a plaintiff's] future health." *Id.* at 843.

By these standards, Plaintiffs have not raised any issue of fact that could get an eighth amendment claim to a jury. Although the parties disagree about whether Galen McGarvey asked for and was refused his medication, nothing in the record suggests that Defendants actually knew of a risk so serious that it jeopardized Galen McGarvey's future health. In fact, Galen McGarvey's own deposition testimony suggests that Defendants thought the contrary was true: that Galen was not put in any risk at all. Galen testified that when he asked Sergeant Bobbitt for his medication, "[h]e told me, you'll be out of jail in two hours, you don't need it." Accordingly, Plaintiffs' eighth amendment claim cannot survive summary judgment and the Court need not consider the defense of qualified immunity.

### V. CONCLUSION

For the foregoing reasons, summary judgment is granted to Defendants.

---

ing items of unusual value such as currency, bullion, securities, and food stamps).

**6.** In fact, Plaintiffs have not even provided this Court with evidence to demonstrate that the permits shown to Defendants met the standards of this subsection.

**7.** Interpreting Plaintiffs' complaint to assert an eighth amendment claim gives it the benefit of a very generous reading. Nevertheless, because Defendants took the trouble to brief the argument against this possible claim, the Court will address it.